[No. S033975. Dec. 16, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL STEPHEN COMBS, Defendant and Appellant.

822

**COUNSEL**

Richard C. Gilman, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, William M. Wood, Sharon L. Rhodes and Robert M. Foster, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**CHIN, J.**—A jury convicted defendant Michael Stephen Combs of the first degree murder (Pen. Code, § 187)[1] of Janine Lee. The jury found true special circumstance allegations of lying in wait (§ 190.2, subd. (a)(15)) and robbery murder (§ 190.2, subd. (a)(17)). It also found true an allegation that defendant committed the murder while released from custody on his own recognizance in an unrelated case (§ 12022.1). After a penalty trial, the jury returned a

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

verdict of death, and the trial court imposed that sentence. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

## I. FACTS

### A. Guilt Phase

#### 1. The Prosecution's Case

##### a. Introduction

On October 24, 1990, defendant asked the victim, Janine Lee, to drive him and Cynthia Purcell to Calico Ghost Town in San Bernardino County.[2] Before giving them a ride, Janine came home to change her clothes and then left in her car. Janine's father, Richard Lee, never saw her again.

The next morning, Richard Lee received a telephone call from a store in Lake Elsinore. Someone had tried to cash a check written on his and Janine's joint checking account. That evening, the police found Janine's body in a remote canyon area near Calico Ghost Town.

A week after Janine's death, the police arrested defendant and Purcell in Arizona after they were involved in an accident while driving Janine's car. In the car and on defendant's person, the officer found incriminating evidence, including Janine's checkbook and a check payable to defendant with Janine's name written on the signature line. That same day, defendant confessed to strangling and beating Janine to death for the purpose of stealing her money and car. Six days later, defendant and Purcell reenacted the killing for the San Bernardino police at the crime scene. The police audiotaped the confession and videotaped the reenactment, and the tapes were played to the jury.

##### b. Check Forgery Case

At the time of the murder, defendant faced check forgery charges in an unrelated case. The victim, Milt Jaffey, was the general manager of the Desert Rose Center for the Arts (Desert Rose), a fitness center in Barstow. Jaffey used Desert Rose as his mailing address for his checking account. In June 1990, he left his job at Desert Rose and moved to Long Beach. He instructed the bank to forward the checks that he had previously ordered to his new address, but the bank failed to do so.

---

[2] The San Bernardino County District Attorney jointly charged defendant and Purcell with first degree murder and alleged that she and defendant committed the murder while lying in wait and during the commission of a robbery. The trial court granted Purcell's motion for separate trials.

In the beginning of September 1990, Danny Smith became the manager of the Torches Motel in Barstow. About that time, defendant rented a room at the motel and began working at Desert Rose as a karate instructor. During the first part of October 1990, defendant asked Smith to cash some checks for him. Smith cashed several checks, including two written on Jaffey's account. Jaffey then discovered that the bank had cashed two forged checks against his account, one payable to "Danny Smith" and the other to "Michael Combs." Both checks bore numbers of a series higher than those in Jaffey's possession.

Defendant was charged with forging Jaffey's checks. On October 16, 1990, the trial court released defendant from custody on his own recognizance. On October 23, 1990, defendant appeared in court regarding the scheduling of a preliminary hearing. On defendant's request, the court continued the hearing for two weeks.

### c. *Events Surrounding the Murder*

On October 24, 1990—a day after his court appearance—defendant asked Smith to give him and Purcell a ride to Calico Ghost Town. Because of a prior engagement, Smith declined. Defendant decided to ask Janine, whom he knew from Desert Rose, where she was also an employee. Janine also knew Smith, who took karate lessons.

In Smith's presence, defendant called Janine and asked her for a ride. At her request, Smith spoke to Janine, assuring her that defendant really needed a ride and confirming that defendant was with him at the motel where Smith worked. When Smith left the motel between 8:00 p.m. and 9:00 p.m., defendant and Purcell were waiting outside for Janine.

In the meantime, sometime after 6:00 p.m. that evening, Janine's father received a telephone call from a man asking for Janine. He related that Janine was at her grandparents' house and could be reached there. Shortly thereafter, Janine came home and changed her clothes. She drove off in her white car about 7:30 p.m.

Also that same evening, Melvin Krizo was camping in a canyon near Calico Ghost Town. Between 9:00 and 9:30 p.m., Krizo saw a light-colored car enter the canyon. The car stopped about 50 yards from Krizo's trailer. In the dark, Krizo used a 10-power spotting scope and saw a young man and young woman exit the car, open the trunk, and walk around the area. The couple got back into the car and drove further into the canyon until Krizo lost sight of them. Sometime later, the car returned and stopped in front of Krizo's trailer for a couple of minutes before driving back into the canyon again.

The next morning, Richard Lee contacted the sheriff's office after receiving information about the attempt to cash one of Janine's checks. That evening, a passerby flagged down a deputy sheriff after discovering Janine's body in Odessa Canyon, near Calico Ghost Town and Krizo's campsite. Janine's wrists had been bound together with a green nylon cord. She suffered bruises, lacerations, and abrasions over the upper portion of her body, including her head and neck. A bone on the left side of her face was visible and there was a ligature imprint on the front of her neck. The police discovered an electrical extension cord on the side of the road leading to the canyon location where Janine's body had been discovered.

The forensic evidence showed that the primary cause of Janine's death was strangulation and the secondary cause was blunt trauma to the head. The ligature mark on Janine's neck was consistent with the type of mark that would have been left by an electrical extension cord similar to the one found by police. The scratch marks, bruising, and abrasions on Janine's neck indicated that she had struggled and tried to relieve the pressure on her neck. The blunt trauma to Janine's head was consistent with injuries that she would have received from having been struck with the flashlight recovered from her car. The blood spatter evidence indicated that Janine had been sitting in an upright position in the front seat of her car when she was hit on the left side of her head.

On November 2, 1990, while driving Janine's car, defendant and Purcell were involved in an automobile accident in Kingman, Arizona. While investigating the accident, an Arizona police officer received a dispatch regarding a homicide and car theft in California. Defendant matched the description of one of the homicide suspects. The car defendant was driving matched the description of the stolen car, including its license plate number. The officer arrested defendant and Purcell. In the car, the police found a checkbook belonging to Janine and her father and a military-type flashlight. In defendant's pants pocket, the police discovered a wallet containing Janine's business card and a check from the checkbook made payable to defendant, with the name Janine Lee written on the signature line. Defendant also possessed a green nylon cord having the same construction and material as the cord that was used to bind Janine's wrists.

### d. *Defendant's November 2, 1990, Confession*

San Bernardino County Sheriff Detectives Mario Lupercio and Dan Finneran went to Kingman, Arizona, and interviewed defendant in the jail there. After he was advised of and waived his constitutional rights, defendant agreed to talk with them. Initially, defendant stated that he did not know who killed Janine and that he last saw her alive in the canyon area. He admitted

that he called Janine from the motel and asked for a ride to Calico Ghost Town, and that Janine wanted to speak to Smith because she did not trust him. Defendant claimed that Janine gave him permission to borrow her car to drive to Mexico. He further claimed that he asked Janine to drive to the canyon so that someone named John Tanoya could drive her back to town, even though she did not know Tanoya.

According to defendant, Janine picked defendant and Purcell up at the motel, dropped Purcell off at Calico Ghost Town, drove defendant to the canyon area where Tanoya was camping, and stayed with Tanoya so that he could drive her back to town. Defendant picked up Purcell, and they drove to Mexico in Janine's car. Defendant admitted that, along the way, he tried to cash one of Janine's checks that she had left in her car and that he had committed forgery.

After the detectives informed defendant they had spoken to a number of people (including Purcell) and did not believe his story, defendant confessed. He described how he had planned to kill Janine, and how and why he had killed her. Defendant related that, several days before the killing, he and Purcell decided to rob someone they knew, because it would be easier than robbing a stranger. They planned to kill their victim. They wanted $500–$1,000 and a car. They chose Smith as their victim from a list of acquaintances, but later reconsidered because Smith did not always have money and there were too many people around the motel where he worked.

The afternoon of the murder, defendant decided they should rob and kill Janine instead. He would call Janine, tell her he wanted to get away from his pending court case, and ask her if she could give him a ride to Calico, where he planned to camp with a friend. Defendant and Purcell planned to choke Janine and then tie her up with a green nylon cord that they had obtained that afternoon. Defendant told Purcell that he would sit behind Janine in the car and strangle her with a white extension cord he had found in the motel. Attempting to find "something better" than the extension cord, they tried unsuccessfully to retrieve a wire that was holding up a sign in the hotel. Eventually, they gave up looking.

That evening, defendant called Janine from the Torches Motel and asked her to drive him and Purcell to Calico. He tricked her by inventing a fictitious friend, John, and asking for a ride to meet him. When Janine questioned defendant's story, defendant asked Smith to speak with her on the telephone. At defendant's request, Smith confirmed that defendant and Purcell were at the motel and needed a ride.

After Smith left the motel, Janine picked up defendant and Purcell and drove them to the Calico campsite area to find John. When they reached

Odessa Canyon, defendant saw a trailer with its lights off on the other side of the canyon. Janine parked the car, and the three started walking towards the trailer. When defendant saw a road leading to the trailer, he suggested they drive there instead. Janine drove and parked near the trailer. Defendant, who was sitting behind Janine with the extension cord wrapped around his hand, put the cord over Janine's head and pulled it against her neck. He consciously pulled the cord hard against her neck without jerking her head back to ensure that her windpipe was closed. To tighten the pressure, he crossed his hands behind Janine and braced his knees against the back of her seat. Because he had been trained as a martial arts instructor, defendant knew exactly how to kill Janine.

Janine tried to grab the extension cord. As defendant pulled harder on the cord, Purcell, who was seated in the front passenger seat, lifted Janine's headrest. Defendant wrapped the cord around the headrest and tied it off. Because Janine too had been trained as a martial arts instructor, defendant knew that he would need to protect himself if she managed to free herself. To ensure that Janine could not grab the electrical cord around her neck, defendant retrieved the green nylon cord in his pocket, gave it to Purcell, and told her to tie Janine's hands.

Janine continued to struggle. Defendant told Purcell to tie Janine's hands through the steering wheel to stop her from "flopping around." When that failed to subdue her, defendant told Purcell to hit Janine's head with a flashlight that was in the car. Purcell struck Janine's right temple about five times, until the flashlight broke. On defendant's instruction, Purcell went outside to get some rocks. Purcell then wrapped Janine's jacket around the rocks, and hit Janine in the face 10 to 15 times. On defendant's further request, Purcell determined that Janine's bowels had moved, indicating that she was dead.

Defendant and Purcell decided to dispose of Janine's body elsewhere in the canyon. In order to remove the body, defendant had to burn the seatbelt off and move the backseat so he could untie the extension cord from the headrest. Defendant dragged Janine's body to the back of the car; then he and Purcell placed the victim in the trunk.

Defendant drove to an area of Odessa Canyon where he had been many times before. Purcell looked through Janine's purse and found a checkbook, but no money or credit cards. Defendant took Janine's body out of the trunk and, on Purcell's request, searched for a wallet. After finding none, they left the body on the ground. As they drove away, Purcell searched the car for money.

Defendant and Purcell drove to Barstow. They tried to cash one of Janine's checks, but the store clerk refused to cash it. They then drove to Mexico. Along the way, they tried to cash two of Janine's checks in Lake Elsinore. They sold some of her property in other locations. After staying some time in Mexico, they returned to the United States because Purcell did not like living in Mexico.

Defendant admitted that he was sober when he first planned the robbery and murder and when he chose Janine as the intended victim. On the day of the murder, he drank no alcohol, but claimed he snorted crystal methamphetamine with Purcell and Smith about four hours before he called Janine. When the detectives asked if he felt bad about what they had done to Janine, defendant reasoned that killing her was not "worth it" because she had no money. The murder would have been "worth it" only if she had had $5,000 to $10,000. When asked if he had trouble sleeping since the killing, defendant replied that he tried not to think about it. Defendant and Purcell laughed about killing Janine and exhibited no remorse.

### e. *Defendant's November 8, 1990 Videotaped Reenactment of the Crime*

On November 8, 1990, six days after defendant first confessed, defendant and Purcell participated jointly in a videotaped reenactment of the crime in which they confessed to killing Janine. On that date, Detective Lupercio and other officers transported defendant and Purcell from Arizona to California. During the drive, defendant and Purcell agreed to reenact the crime on videotape. Detective Lupercio drove to Odessa Canyon and arranged to have Janine's car taken there. At the canyon, the detective advised defendant and Purcell of their constitutional rights. They agreed to talk about the crime. During the reenactment, defendant demonstrated how he had choked Janine and essentially repeated what he had said in his prior confession. Purcell confirmed many of defendant's incriminating statements.

### 2. *The Defense's Case*

The defense conceded that defendant and Purcell killed Janine. The primary defense theory at trial was that defendant was unable to form the requisite mental states of specific intent, premeditation and deliberation, and malice aforethought based on his alleged mental defects, disorders, and impairments. In presenting that defense, defendant relied on the testimony of Dr. Crinella, a clinical psychologist. Dr. Crinella diagnosed defendant as suffering from childhood brain damage, schizophrenia, and a borderline personality disorder. Although Dr. Crinella had no opinion regarding defendant's intent when committing the crimes, he opined that defendant's mental disorders influenced the actions that led him to kill Janine.

On cross-examination, Dr. Crinella testified that defendant was not mentally retarded, knew right from wrong, and committed crimes for excitement or an "adrenaline rush." He acknowledged that other doctors had reached different diagnoses, finding instead that defendant had a sociopathic or antisocial personality disorder. Dr. Crinella admitted that defendant could have planned for nearly a week to commit the robbery and murder, and that he likely found the planning process exciting. Defendant told Dr. Crinella that he found that killing Janine gave him the "ultimate high" and an "adrenaline rush" that lasted three days, that he committed the crimes because he needed Janine's car and money to get out of town, and that he chose her because she was available.

### B. The Penalty Phase

#### 1. The Prosecution's Case

In addition to relying on the circumstances of the charged offenses, the prosecution introduced evidence that in 1984 defendant had two juvenile adjudications for armed robbery with the use of a knife. He also had four prior adult felony convictions: attempted second degree burglary and attempted vehicle theft in 1985, attempted escape in 1987, and forgery of a $3,500 check in 1989. He had also threatened to use force or violence with homemade weapons during three separate jail incidents in 1992.

#### 2. The Defense's Case

The defense presented evidence—through the testimony of defendant's relatives, teachers, and mental health professionals—about defendant's family background, learning disabilities, medical and psychiatric history, and mental condition. Defendant grew up in Colorado. Defendant's relatives testified that his parents adopted him when he was 18 months old. Although defendant was very close to his mother, she became occupied with the care of a severely disabled brother who was born when defendant was five years old. When defendant was 16 years old, his mother died, and his father temporarily abandoned the family several months later; defendant then began to have problems in school and began stealing from relatives. Defendant's father returned about a year later and remarried; defendant's relationship with him deteriorated. Defendant's relatives further testified that his parents did not physically or psychologically abuse him.

Defendant's teachers testified that, when he was a child, defendant was classified as a slow learner and placed in special education programs. However, they did not consider defendant to be mentally handicapped and believed that he had the abilities and the IQ to function normally in society, with proper training and help.

In October 1983, defendant was admitted to a Colorado psychiatric hospital and treated for depression. Dr. John Graves, the treating psychiatrist, concluded that defendant suffered from depression, with some bipolar or manic features, and from "complicated bereavement." Dr. Graves believed that if defendant received long-term inpatient care, his mental problems could be treated. However, defendant was discharged after his father refused to pay for further treatment. In support of his decision, defendant's father noted that the doctors had not found defendant to be psychotic; he believed that no one could help defendant until defendant was willing to change. Dr. Graves acknowledged that when defendant was discharged from the hospital, he was functioning at a high enough level to be returned to the outside environment and high school.

In February 1986, when defendant was 19 years old, he voluntarily admitted himself into a residential psychiatric crisis facility in San Diego for 12 days. Dr. Robert Poor, a psychologist, diagnosed defendant as suffering from major depression and showing significant signs of having an antisocial personality disorder. Because defendant had manipulated the staff by relating conflicting stories and displaying inconsistent behaviors to different staff members, they believed that defendant had been malingering. Defendant acknowledged that he knew what he was doing and called it a game. At one point, defendant threatened to kill his father, but the staff and defendant's sister did not take the threat seriously; it was simply part of his continual attention-seeking behavior. At the end of the 12-day period, Dr. Poor and the staff concluded that defendant could function in society on his own with outpatient therapy and scheduled defendant for release.

Although the defense mental health experts agreed that defendant suffered from mental illness, their diagnoses differed. Dr. Graves opined that defendant suffered from posttraumatic stress disorder, a mixed-type personality disorder, and complicated bereavement. He believed that defendant was sane, but suffered from a mental illness that prevented him from considering the consequences of his actions. Based on defendant's account, Dr. Graves further concluded that defendant was intoxicated with amphetamines when he committed the crimes and that his intoxication aggravated his manic-depressive illness.

Dr. Edward Fischer, a clinical psychologist, conducted neuropsychological tests on defendant. Dr. Fischer concluded that defendant suffered from schizophrenia and mania, even though he had never suffered from hallucinations or delusions. Dr. Fischer also believed that defendant had a brain dysfunction that he had been born with or that he had developed at an early age. Dr. Fischer did not agree with Dr. Graves that defendant exhibited signs of depression.

Dr. Crinella testified that electroencephalogram (EEG) tests and a magnetic resonance imaging (MRI) scan showed abnormalities and lesions in defendant's brain. The doctor concluded that defendant suffered from an organic brain syndrome, having suffered brain damage early in life, perhaps prenatally.

### 3. Prosecution Rebuttal Evidence

Dr. Oshrin, a forensic psychiatrist who specialized in working with criminals, interviewed defendant on November 23, 1990. The doctor did not find that defendant was depressed, but instead found him to be in control of himself, coherent, of average intelligence, and able to communicate and think clearly. Defendant told Dr. Oshrin that he only took amphetamines about twice a year and was not addicted. Regarding the murder, defendant admitted that he and Purcell killed Janine to steal her money and had planned how they would do it. He knew that killing was wrong and against the law.

Dr. Oshrin concluded that defendant was not suffering from an organic brain disorder, psychosis, or any specific or identifiable mental illness. He believed that age caused defendant's brain lesions. The doctor diagnosed defendant as having a probable antisocial personality disorder and exhibiting the characteristics of a good con artist. This disorder did not affect defendant to the extent that he did not know of or could not control his actions. Dr. Oshrin did not believe that the psychological tests the defense experts used had any place in forensic psychiatry.

While in jail in December 1992, defendant told Robin Hunt, a nurse, that his goal was to obtain a mental illness diagnosis, which he hoped would reduce the charges against him. He planned to inflict wounds on himself to manipulate the staff into finding that he had a mental illness.

## II. DISCUSSION

### A. Guilt Phase Issues

#### 1. Leg Restraints

Defendant contends that his Fifth, Sixth, Eighth, and Fourteenth Amendment rights under the United States Constitution were violated because he was placed in leg restraints during trial. We disagree.

Part of the jury selection process was held in a building in the Orange Show Fairgrounds. Because of security concerns at that location, the trial court stated its intent to have defendant placed in leg restraints during jury

selection. Defendant stipulated to the leg restraints "as long as they're not visible." To ensure that the potential jurors would not see defendant's leg restraints, the court stated that "the counsel table and the physical layout of the courtroom in that building will be laid out such so that none of the prospective jurors that get anywhere close to the counsel table can see any leg restraints." The court further guaranteed that defendant would be brought into and taken out of the courtroom outside the presence of the jury and that the glass doors to the room would be covered with paper.

Defendant later made a motion to remove the leg restraints for the remainder of the trial. The prosecutor simultaneously moved to keep defendant in leg restraints throughout the trial. The trial court granted the prosecution's motion, ordering that leg restraints be placed on defendant during trial.

 "A criminal defendant cannot be physically restrained in the jury's presence unless there is a showing of manifest need for such restraints. [Citation.] Such a showing, which must appear as a matter of record [citation], may be satisfied by evidence, for example, that the defendant plans to engage in violent or disruptive behavior in court, or that he plans to escape from the courtroom [citation]. A shackling decision must be based on facts, not mere rumor or innuendo." (*People v. Anderson* (2001) 25 Cal.4th 543, 595 [106 Cal.Rptr.2d 575, 22 P.3d 347].) " 'The imposition of physical restraints in the absence of a record showing of violence or *a threat of violence or other nonconforming conduct* will be deemed to constitute an abuse of discretion.' [Citation.] A reviewing court will uphold the decision of the trial court to shackle a defendant, however, absent an abuse of discretion. [Citation.]" (*People v. Hawkins* (1995) 10 Cal.4th 920, 944 [42 Cal.Rptr.2d 636, 897 P.2d 574], italics added, overruled on other grounds in *People v. Lasko* (2000) 23 Cal.4th 101, 110 [96 Cal.Rptr.2d 441, 999 P.2d 666].)

Here, the record amply demonstrates that defendant had threatened violence and engaged in nonconforming conduct. In ruling as it did, the trial court relied on the report of a psychologist, Dr. Malancharuvil, who had evaluated defendant pursuant to section 1368. Dr. Malancharuvil's report stated that defendant was a serious suicidal and homicidal risk; defendant had threatened to "nut up" in the courtroom and had detailed "how he would set himself up to be shot by one of the deputies by fighting with one of them or some court official." In addition, the report stated the following: "Because [defendant] has decided it would be against his interest to go through the trial, he becomes resistant, suicidal and disruptive *as the trial date approaches*. He uses intimidation, manipulation and decompensation as methods of resisting trial. He's likely to be at least initially disruptive during the trial process, particularly in the early stages of trial. He should be carefully

watched immediately prior to and during the trial process, as he's likely to incite officers to get into a scuffle with him."[3]

The trial court further relied on the prosecutor's representation that, on February 19, 1992, defendant had possessed two shanks in jail and had threatened jail deputies. Defendant did not dispute that factual assertion. Thus, we conclude that the record supports the court's finding of defendant's potential for violence and its concern for the safety of defendant, deputies, and others in the courtroom. (*People v. Pride* (1992) 3 Cal.4th 195, 232–233 [10 Cal.Rptr.2d 636, 833 P.2d 643] [series of threats against deputies]; *People v. Duran* (1976) 16 Cal.3d 282, 292, fn. 11 [127 Cal.Rptr. 618, 545 P.2d 1322] ["[a]n accused may be restrained . . . on a showing . . . that he plans to disrupt proceedings"]; see also *People v. Alvarez* (1996) 14 Cal.4th 155, 190–192 [58 Cal.Rptr.2d 385, 926 P.2d 365] [possession of explosive device and weapons in jail was grounds for restraint].)

Nevertheless, defendant argues that Dr. Malancharuvil's report should have been updated to contain more current information—the doctor's report was dated April 24, 1992, but trial began in February 1993—and that other alternative security measures, such as the use of more guards, should have been considered. However, defendant never complained that Dr. Malancharuvil's report contained outdated or inaccurate information, nor did he request that alternative security measures be tried first. He only argued that the restraints were unnecessary because he had not tried to escape from the courtroom and had not caused anyone harm there. When the trial court announced it would follow the same procedure during trial as it had during the voir dire proceedings in the Orange Show Fairgrounds to ensure that the jury would not see the leg restraints, defendant did not claim that those procedures were ineffective. He asked only that the court follow the normal procedure of having only two uniformed deputies in the courtroom, to which the court agreed. Moreover, defendant acknowledged that he had "discipline problems as late as December 1992, and a previous incident in August 1992," but he attempted to minimize them as "relatively minor."

■ Finally, "we have consistently held that courtroom shackling, even if error, was harmless if there is no evidence that the jury saw the restraints, or that the shackles impaired or prejudiced the defendant's right to testify or participate in his defense." (*People v. Anderson, supra,* 25 Cal.4th at p. 596; see *People v. Tuilaepa* (1992) 4 Cal.4th 569, 583–584 [15 Cal.Rptr.2d 382,

---

[3] In addition to Dr. Malancharuvil's report, the prosecution presented the report of Dr. Kania, another court-appointed psychologist who had evaluated defendant pursuant to section 1368. Dr. Kania had also opined that defendant was likely to incite a fight with deputies before and during trial. Defendant objected to the court's reliance on Dr. Kania's report on the ground that defendant had retained that doctor, and any information he provided regarding defendant was confidential. The trial court agreed to consider only Dr. Malancharuvil's report.

842 P.2d 1142].) Here, defendant did not testify at the guilt or penalty phase of trial, and there is no evidence or claim his leg restraints influenced him not to do so, or that they distracted him or affected his demeanor before the jury. (See *People v. Mar* (2002) 28 Cal.4th 1201, 1219 [124 Cal.Rptr.2d 161, 52 P.3d 95].) Because there is no evidence that the jury ever saw the restraints, we have no basis to find that defendant was prejudiced. (*People v. Coddington* (2000) 23 Cal.4th 529, 651 [97 Cal.Rptr.2d 528, 2 P.3d 1081], overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618] [any error harmless where defendant failed to complain during trial that procedures were not followed to hide leg restraints or that jury saw them].)

### 2. *Evidentiary Issues*

#### a. *Statements Made During Videotaped Reenactment of Crime*

On November 8, 1990, defendant and Purcell participated jointly in a videotaped reenactment of the crime in which they confessed to killing Janine. Defendant contends that the admission of Purcell's statements during the videotaped reenactment violated his United States Constitution Sixth Amendment right of confrontation. He further claims that the admission of his own statements violated his United States Constitution Fifth Amendment privilege against self-incrimination and his Sixth Amendment right to counsel. We conclude that the claims lack merit.

#### 1) *Underlying Facts*

On Detective Lupercio's request, defendant and Purcell sat in Janine's car in the same positions as they had on the night of the murder. Defendant then described in detail and demonstrated how he had choked Janine. He also related that he instructed Purcell to hit Janine on the head with the flashlight to ensure that she was dead, and to find rocks outside and wrap them in Purcell's jacket, and to hit Janine on the head with the rocks, which Purcell proceeded to do. They then tied Janine's hands together with nylon cord.

In defendant's presence, Purcell confirmed that on defendant's request she struck Janine in the head with a flashlight that was in the car, struck Janine several times in the head with rocks wrapped in Janine's jacket, and retrieved a cord from defendant's jacket and used it to tie Janine's hands together. Purcell added that defendant asked her to see if Janine was dead by checking her pulse and if she had soiled herself. Purcell felt that Janine's leg was wet, but could not tell if Janine's heart was still beating because her own heart was beating so heavily.

Defendant recounted that their initial plan was to kill Smith for a car and money, but that they decided to kill Janine instead. When defendant stated that he and Purcell initially talked about killing Smith one or two days before they killed Janine, Purcell interrupted and said that, "It was that day." Defendant agreed that they might have planned to kill someone either that same day or the day before. Although their initial plan was for Purcell to distract Smith so that defendant could hit him on the head, they decided against it because there were too many people at the motel.

When asked if she agreed with defendant, Purcell responded that she did not have any "thought of murder," that defendant mentioned hitting Smith on the head, and that she did not think it was a good idea because Smith had no money. When defendant suggested Janine, Purcell claimed that "half of me was serious about it and half of me never thought it would happen."

At one point, Detective Lupercio questioned defendant and Purcell separately; defendant stood outside, while Purcell remained in the car. Defendant stated that, when he took Janine's body out of the trunk, he checked to see if she was still breathing. When Purcell yelled that she found no money or wallet in Janine's purse, defendant searched her body. When Detective Lupercio questioned Purcell separately about what she was doing while defendant unloaded Janine's body, Purcell confirmed that she had searched the car and Janine's purse and yelled out to defendant that she found no wallet or money. She added that she was angry about "everything." Purcell related that, after leaving the canyon, they disposed of Janine's property in various places and tried unsuccessfully to cash some of her checks in Barstow. They were later able to cash a check that defendant "had written." Purcell further confirmed that they had planned to lure Janine to Odessa Canyon to steal her money and car.

Detective Lupercio spoke alone with defendant again. Defendant confirmed that they tried to cash some of Janine's checks in Barstow and disposed of her property at various places between the killing and their arrest.

### 2) *Purcell's Statements During Videotaped Reenactment*

During trial, defendant moved to excise Purcell's statements from the videotape on the ground that they were self-serving attempts to diminish her responsibility and to shift the blame to defendant, and thus, were inadmissible under *People v. Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265], and *Bruton v. United States* (1968) 391 U.S. 123 [20 L.Ed.2d 476, 88 S.Ct. 1620]. The prosecutor opposed the motion, arguing that Purcell's statements were admissible hearsay qualifying as declarations against penal

interest or adoptive admissions. The trial court denied the motion, finding that—unlike the situation in *Aranda* and *Bruton*—Purcell's statements were not untrustworthy or self-serving. She incriminated herself and did not attempt to place more blame on defendant. To the extent she incriminated defendant, she simply confirmed what he had already confessed to. The court admitted the videotape and its transcription, which included Purcell's statements.

■ Defendant argues that admission of Purcell's statements violated the *Aranda/Bruton* rule. We have rejected a similar argument. (*People v. Brown* (2003) 31 Cal.4th 518, 537 [3 Cal.Rptr.3d 145, 73 P.3d 1137].) "The *Aranda/Bruton* rule addresses the situation in which 'an out-of-court confession of one defendant . . . incriminates not only that defendant but another defendant *jointly charged.*' (*People v. Fletcher* (1996) 13 Cal.4th 451, 455 [53 Cal.Rptr.2d 572, 917 P.2d 187], italics added, fn. omitted.) 'The United States Supreme Court has held that, because jurors cannot be expected to ignore one defendant's confession that is "powerfully incriminating" as to a second defendant when determining the latter's guilt, admission of such a confession *at a joint trial* generally violates the confrontation rights of the nondeclarant.' (*Ibid.*, italics added.) In this case, [declarant] was not jointly charged or tried with defendant, but was separately tried and convicted of murder. Accordingly, the *Aranda/Bruton* rule does not preclude admission of [declarant's] extrajudicial statements against defendant." (*Ibid.*)

■ Defendant further argues that, because the "majority" of Purcell's statements shifted the principal blame for the homicide onto defendant while minimizing her own role, the statements were unreliable and thus violated his United States Constitution Sixth Amendment right to confrontation. In *Ohio v. Roberts* (1980) 448 U.S. 56 [65 L.Ed.2d 597, 100 S.Ct. 2531], the high court held that the confrontation clause does not bar admission of an unavailable witness's hearsay statement against a defendant if the statement bears "adequate 'indicia of reliability.' " (*Id.* at p. 66.) To meet the requirement of reliability under the *Roberts* test, the evidence must fall either within a "firmly rooted hearsay exception" or contain "particularized guarantees of trustworthiness" such that adversarial testing would be expected to add little, if anything, to the statement's reliability. (*Ibid.*) "[T]he 'particularized guarantees of trustworthiness' required for admission under the Confrontation Clause must . . . be drawn from the totality of circumstances that surround the making of the statement and that render the declarant particularly worthy of belief." (*Idaho v. Wright* (1990) 497 U.S. 805, 820 [111 L.Ed.2d 638, 110 S.Ct. 3139].)

In finding Purcell's statements to be reliable and trustworthy, the trial court noted that: (1) the statements were against her penal interests, and/or

(2) Purcell confirmed defendant's description of the crime throughout the videotape—including her own culpability—and never blamed defendant any more than he had already blamed himself. Thus, the court found her statements admissible as statements against her penal interest or as adoptive admissions.

■ However, since then, the high court has overruled the test in *Ohio* v. *Roberts, supra,* 448 U.S. 56. (*Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354, 1369–1374] (*Crawford*).) Instead, *Crawford* held that "[w]here testimonial [hearsay] evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." (*Id.* at 541 U.S. at p. 68 [124 S.Ct. at p. 1374].) Although the high court did not comprehensively define the term "testimonial," it noted, "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to *police interrogations.*" (*Id.* at 541 U.S. at p. 68 [124 S.Ct. at p. 1374], italics added.) It further noted that "The [Confrontation] Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." (*Id.* at p. 59, fn. 9 [124 S.Ct. at p. 1369].)

Although we question whether *Crawford* can be applied retroactively to cases with final judgments (see *Crawford, supra,* 541 U.S. at pp. 69, 75–76 [124 S.Ct. at pp. 1374, 1378] (conc. opn. of Rehnquist, C. J.) [describing majority decision as "a mantle of uncertainty over future criminal trials in both federal and state courts"; "the new rule"; and "a change of course"]), we need not decide that issue because defendant's Sixth Amendment right to confrontation was not implicated. As in *Crawford,* here, Purcell's statements made during the police interrogation are testimonial, and it does not appear from the record that defendant had a prior opportunity for cross-examination. (*Crawford, supra,* 541 U.S. at pp. 53, 61–62, fn. 4 [124 S.Ct. at pp. 1365 & 1370].) Defendant did not dispute Purcell's unavailability at trial, nor does he do so on appeal. However, Purcell's statements incriminating defendant were not admitted for purposes of establishing the truth of the matter asserted, but were admitted to supply meaning to defendant's conduct or silence in the face of Purcell's accusatory statements. (*People v. Silva* (1988) 45 Cal.3d 604, 624 [247 Cal.Rptr. 573, 754 P.2d 1070]; CALJIC No. 2.71.5.) "[B]y reason of the adoptive admissions rule, once the defendant has expressly or impliedly adopted the statements of another, the statements become *his own admissions* . . . . [Citation.] Being deemed the defendant's own admissions, we are no longer concerned with the veracity or credibility of the original declarant." (*Silva, supra,* 45 Cal.3d at p. 624.)

■ "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with

knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth." (Evid. Code, § 1221.) The statute contemplates either explicit acceptance of another's statement or acquiescence in its truth by silence or equivocal or evasive conduct. "There are only two requirements for the introduction of adoptive admissions: '(1) the party must have knowledge of the content of another's hearsay statement, and (2) having such knowledge, the party must have used words or conduct indicating his *adoption* of, or his *belief in*, the truth of such hearsay statement.' [Citation.]" (*People v. Silva, supra,* 45 Cal.3d at p. 623.) Admissibility of an adoptive admission is appropriate when " 'a person is accused of having committed a crime, under circumstances which fairly afford him an opportunity to hear, understand, and to reply, and which do not lend themselves to an inference that he was relying on the right of silence guaranteed by the Fifth Amendment to the United States Constitution . . . .' " (*People v. Riel* (2000) 22 Cal.4th 1153, 1189 [96 Cal.Rptr.2d 1, 998 P.2d 969].)

In defendant's presence, Purcell stated that: (1) defendant directed her to strike Janine with the flashlight and rocks, to determine if she was dead, and to tie her hands, and (2) defendant came up with the idea of robbing and killing Janine. Defendant's own prior direct admissions confirmed the truth of Purcell's statements. Purcell said nothing incriminating that defendant himself had not already admitted. After Purcell corroborated defendant's prior admissions, he never retracted them; thus, he continued to acknowledge the truth of Purcell's statements. Under these circumstances, her statements inculpating defendant during the joint interview qualify as adoptive admissions.

Purcell further stated—out of defendant's presence—that they disposed of Janine's property and attempted to cash her checks after the killing and robbery. When the police later related Purcell's statements to defendant, he confirmed their accuracy. Thus, he expressly adopted them.

Having concluded that Purcell's statements were admissible under the adoptive admissions rule, the trial court submitted to the jury the question whether defendant's conduct actually constituted an adoptive admission. The jury was instructed how to consider the evidence, including that "[e]vidence of such an accusatory statement is not received for the purpose of proving its truth, but only as it supplies meaning to the silence and conduct of the accused in the face of it. Unless you should find that the defendant's silence and conduct at the time indicated an admission that the accusatory statement was true, you should entirely disregard the statement." (CALJIC No. 2.71.5.)

Thus, because Purcell's statements were admitted for a nonhearsay purpose, defendant's Sixth Amendment right was not implicated. (*United*

*States v. Kehoe* (8th Cir. 2002) 310 F.3d 579, 590–591; *Globe v. Florida* (Fla. 2004) 877 So.2d 663, 672–673.)

### 3) *Defendant's Statements and Conduct During Videotaped Reenactment of Crime*

Defendant orally moved to suppress his videotaped statements without stating a basis for the motion. The prosecution filed a written opposition, arguing that defendant made his statements voluntarily because the police did not engage in physical or psychological pressure when they interviewed him.

At the suppression hearing, defense counsel informed the trial court that the "general nature" of the motion to suppress was "on the issue of voluntariness." Counsel claimed that defendant's *Miranda* waiver (*Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602]) was invalid because he did not specifically waive his rights to remain silent and obtain counsel. The trial court rejected the claim, finding that defendant was adequately advised of and validly waived his *Miranda* rights. The court then asked defense counsel about the previous "general objection" on the voluntariness issue, inquiring whether he wanted to make an objection for the record. Defense counsel declined and merely submitted the issue. The court ruled as follows:

"With respect to the video crime scene reenactment, the advisal of rights were given again by Detective Lupercio. I believe right after the advisal of rights there was a question by Detective Lupercio—or a statement to the effect, 'Well, we didn't force you do to this, did we?' And the answer from both Miss Purcell and [defendant] was 'no.'

"The Court paid particular attention to the demeanor of—this is with respect to Court's Exhibit 2, the video, the Court paid particular attention to the demeanor of Detective Lupercio, the demeanor of Miss Purcell and [defendant]. As far as the Court could tell, Detective Lupercio was not overbearing or intimidating. Miss Purcell and [defendant] were handcuffed in front, but other than that, there was no further restraints on them other than the ones that would go along with someone being in custody.

"The tone of [defendant's] voice on Exhibit 2 was very controlled, it was very unemotional.

"As [defense counsel] pointed out, there were a couple of times, particularly around the discussion of the flashlight, when Miss Purcell appeared to sob for a very brief few moments, but other than that, Miss Purcell didn't have too much show of emotion.

"And based on all of those considerations, the Court is satisfied by a preponderance of the evidence, and in fact beyond a reasonable doubt, that the waiver of the constitutional rights, both [defendant] and Miss Purcell, were free and voluntary and they were intelligently made, and the Court will deny the motion, defense motion, to exclude [the videotape] on that basis also."

On appeal, defendant appears to have abandoned the claim that his waiver was invalid because he did not specifically waive his privilege against self-incrimination and right to counsel. Rather, he contends that his United States Constitution Fifth and Sixth Amendment rights were violated because he did not knowingly, intelligently, and voluntarily waive his privilege against self-incrimination, waive his right to counsel, and consent to the videotaped interview. He argues that: (1) the circumstances surrounding the videotaped reenactment were "not conducive to a knowing and intelligent waiver," and (2) he did not receive a "precise indication that he was entitled to counsel and that one would be appointed for him." We disagree.

"*Miranda* holds that '[t]he defendant may waive effectuation' of the rights conveyed in the warnings 'provided the waiver is made voluntarily, knowingly and intelligently.' [Citation.] The inquiry has two distinct dimensions. [Citations.] First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. [Citations.]" (*Moran v. Burbine* (1986) 475 U.S. 412, 421 [89 L.Ed.2d 410, 106 S.Ct. 1135].)

Defendant contends that he did not voluntarily waive his rights because law enforcement held him isolated in custody for a long time without arraigning him or giving him the ability and opportunity to contact counsel. Because defendant failed to raise these claims in the trial court, he has forfeited them on appeal. (*People v. Clark* (1993) 5 Cal.4th 950, 988, fn. 13 [22 Cal.Rptr.2d 689, 857 P.2d 1099] [claim that car trip was a coercive psychological ploy designed to compel confession forfeited; the defendant failed to rely on the purportedly coercive nature of car trip in trial court].) As the Attorney General states, no evidence was presented at the suppression hearing addressing whether the duration and nature of defendant's confinement, including the car trip and the location of the interrogation, rendered defendant's confession involuntary. Nor was any showing made that defendant ever requested counsel, that his arraignment was illegally delayed, or that

his admissions were the product of such a delay. (*People v. Sapp* (2003) 31 Cal.4th 240, 270 [2 Cal.Rptr.3d 554, 73 P.3d 433] [the defendant failed to make necessary showing that confessions were product of illegal delay in arraignment].)

Moreover, defendant does not now dispute the trial court's factual findings regarding the "general" voluntariness of his videotaped statements, nor could he effectively dispute those findings. Indeed, defendant simply repeated the same admissions he had made to the police six days earlier on the day of his arrest. Under these circumstances, we will not address defendant's current claim of involuntariness for the first time on appeal. (*People v. Ray* (1996) 13 Cal.4th 313, 339 [52 Cal.Rptr.2d 296, 914 P.2d 846] [parties had no incentive to litigate involuntariness theory fully below, and trial court had no opportunity to resolve material factual disputes and make necessary factual findings].)

Defendant's second claim that he was inadequately advised of his right to counsel is clearly without merit. At the Evidence Code section 402 hearing, Detective Lupercio testified that he read defendant the *Miranda* warnings from a department-issued card. He began the videotaped interview with the following advisements:

"Lupercio: Ok, before we go on I'm going to read you your rights. Ok? You have the absolute right to remain silent, anything you say can and will be used as evidence against you in a court of law. You have the right to consult with an attorney, to be represented by an attorney, and to have an attorney present *before and during questioning*. If you cannot afford an attorney, one will be appointed by the court, free of charge to represent you before and during questioning if you desire. Just answer yes or no. Do you understand the rights I have just explained to you?

"[Defendant]: Yes.

"Purcell: Yes.

"Lupercio: With these rights in mind are you willing to talk to me about the charges against you?

"[Defendant]: Yes.

"[Purcell]: Yes.

"Lupercio: For the purpose of this tape also in no way were you forced to come up here to do this video reenactment, is that correct?

"[Defendant]: That's correct.

"[Purcell]: That's correct."

Defendant was told in no uncertain terms that he had the right to consult with, to be represented by, and to have an attorney present before and during questioning, and the further right to have counsel appointed if he was indigent. He never requested an attorney or indicated that he wished to end the interview. (*People v. Whitson* (1998) 17 Cal.4th 229, 249–250 [70 Cal.Rptr.2d 321, 949 P.2d 18].) Finally, defendant fails even to suggest what advisements should have been given. Because he was given the standard *Miranda* advisements, and because he stated that he understood his rights and was willing to talk with the police, defendant's claim that he was not fully advised of his right to counsel fails. (*Duckworth v. Eagan* (1989) 492 U.S. 195, 201–205 [106 L.Ed.2d 166, 109 S.Ct. 2875]; *People v. Sully* (1991) 53 Cal.3d 1195, 1233 [283 Cal.Rptr. 144, 812 P.2d 163].)

### b. *Family Members' Testimony*

Defendant argues that the trial court violated his United States Constitution Fifth and Fourteenth Amendment rights by admitting the irrelevant and highly prejudicial testimony of Janine's family members.

The trial court admitted the testimony of Janine's father and sister, which was brief. Her father, Richard Lee, testified that, on October 24, 1990, someone called their house and asked to speak with Janine. Richard Lee related that Janine was not home and could be contacted at her grandparents' house. Janine returned home about 7:00 p.m. and drove off in her white 1988 Ford Tempo about 7:30 p.m. That was the last time Richard Lee saw his daughter. The next morning, someone from a store in Lake Elsinore called and informed him that a man had tried to cash one of Janine's checks. After receiving that information, he notified the police. Richard Lee identified the checkbook found in Janine's car—last driven by defendant—as belonging to Janine and stated that she always carried it.

Janine's sister, Linda Lee, testified that she had two brothers and a sister, Janine, and that Richard Lee was their father. Linda identified Janine from an autopsy photograph.

Defendant did not object to the admission of the above testimony. Consequently, his claim is forfeited on appeal. (Evid. Code, § 353, subd. (a); *People v. Raley* (1992) 2 Cal.4th 870, 896 [8 Cal.Rptr.2d 678, 830 P.2d 712].)

In any event, the claim lacks merit. Richard Lee's identification of Janine's checkbook and car and his testimony that he learned someone had tried to

cash her check the morning after her disappearance corroborated defendant's confession and were relevant to establish that defendant killed Janine to steal her money and car. His testimony relating to the call Janine received and her later departure corroborated defendant's confession that he tricked Janine into giving them a ride that night and was relevant to establish premeditation and deliberation. In addition, Richard Lee's testimony served to fill in the chronology of events from the evening of October 24, when Janine disappeared, to the following morning. (See *People v. Bolin* (1998) 18 Cal.4th 297, 322 [75 Cal.Rptr.2d 412, 956 P.2d 374] [testimony of victim's relatives properly admitted to fill in chronology of events].)

Linda's identification was relevant to prove that Janine was a human being who had been alive before the alleged criminal act had occurred and was dead afterwards. (See *People v. Bonin* (1989) 47 Cal.3d 808, 849 [254 Cal.Rptr. 298, 765 P.2d 460]; see also *People v. Scheid* (1997) 16 Cal.4th 1, 15 [65 Cal.Rptr.2d 348, 939 P.2d 748] [photograph showing bloodied, lifeless body relevant to establish murder had occurred].)[4]

Finally, the testimony was not unduly prejudicial. As the Attorney General points out, the testimony was brief and factual, and the record does not reflect that either witness made any emotional outbursts. (*People v. Kipp* (1998) 18 Cal.4th 349, 374 [75 Cal.Rptr.2d 716, 956 P.2d 1169].) Thus, the trial court properly admitted the testimony of the victim's family members.

### c. *Blood Spatter Evidence*

Criminalist Craig Ogino testified that blood spatter evidence showed that Janine had been sitting in an upright position in her car when she was hit on the left side of her head. Defendant argues that the trial court erred in admitting that evidence because: (1) it was presented as if it had an "aura of scientific infallibility," and (2) Ogino was not qualified to testify as an expert on blood spatter evidence. Because defendant did not object to the blood spatter testimony or to Ogino's qualification as an expert on blood spatter evidence in the trial court, defendant has forfeited both issues. (*People v. Bolin, supra,* 18 Cal.4th at p. 321.)

In any event, the claim fails on the merits. Regarding the first issue, defendant fails to explain how the testimony was presented with an "aura of scientific infallibility," nor do we discern any such "aura." (See *People v. Clark, supra,* 5 Cal.4th at p. 1018 [blood spatter analysis testimony does not produce an aura of scientific infallibility].)

---

[4] Although we have observed that a relative's testimony may be inadmissible to establish the identity of a murder victim if there is an offer to stipulate to the facts to be established by the testimony (*People v. Wash* (1993) 6 Cal.4th 215, 247 [24 Cal.Rptr.2d 421, 861 P.2d 1107]), defendant did not offer to stipulate to those facts.

Regarding the second claim, the record amply supports Ogino's qualification as an expert in blood spatter evidence. (See Evid. Code § 720, subds. (a), (b).) The record reveals that Ogino had a bachelor of science degree in chemistry and was working towards a master's degree in criminalistics from California State University at Los Angeles. He had taken classes in forensic microscopy and bloodstain pattern interpretation taught by particular individuals or at other institutions. He was employed as a criminalist with the San Bernardino County Sheriff's Department crime laboratory and had previously worked at the Los Angeles County Coroner's Office in the serology section. In addition, he taught classes in his field of expertise.

Defendant complains that Ogino's expertise was not established because he failed to state that the specified classes he attended had been taught at a university or by qualified individuals, or to specify how many tests he had conducted in the past. These complaints regarding the degree of his knowledge go more to the weight of the evidence than to its admissibility. (*People v. Bolin, supra,* 18 Cal.4th at p. 322.) Moreover, defense counsel could have questioned Ogino on these subjects during cross-examination, but did not do so. Ogino's educational background and work experience fully qualified him to testify as an expert on blood spatter evidence. (*Ibid.*; *People v. Clark, supra,* 5 Cal.4th at pp. 1018–1019.)

### 3. *Sufficiency of the Evidence*

■ Defendant contends the evidence, in several respects, was insufficient to support the judgment. In reviewing a criminal conviction challenged as lacking evidentiary support, " 'the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Hillhouse* (2002) 27 Cal.4th 469, 496 [117 Cal.Rptr.2d 45, 40 P.3d 754].) The same standard of review applies to special circumstance allegations. (*People v. Maury* (2003) 30 Cal.4th 342, 396 [133 Cal.Rptr.2d 561, 68 P.3d 1].) An appellate court must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11 [82 Cal.Rptr.2d 413, 971 P.2d 618].)

### a. *First Degree Murder Conviction; Robbery-murder Special-circumstance Finding.*

The prosecution tried the case under a theory that Janine's murder either was deliberate and premeditated or was perpetrated during the commission of

a robbery. Defendant claims that the jury's verdict of first degree murder is not supported by sufficient evidence on either theory.

### 1) *Deliberate, Premeditated Murder*

Defendant contends that the prosecution presented insufficient evidence of premeditation and deliberation because none of the categories of evidence set forth in *People v. Anderson* (1968) 70 Cal.2d 15 [73 Cal.Rptr. 550, 447 P.2d 942] were met in this case. In *Anderson*, we "identified three categories of evidence relevant to resolving the issue of premeditation and deliberation: planning activity, motive, and manner of killing." (*People v. Bolin, supra*, 18 Cal.4th at p. 331.) However, these factors are not exclusive, nor are they invariably determinative. (*People v. Silva* (2001) 25 Cal.4th 345, 368 [106 Cal.Rptr.2d 93, 21 P.3d 769].) " '*Anderson* was simply intended to guide an appellate court's assessment whether the evidence supports an inference that the killing occurred as the result of preexisting reflection rather than unconsidered or rash impulse. [Citation.]' " (*Bolin, supra*, 18 Cal.4th at pp. 331–332.)

As to planning and motive, defendant asserts that the evidence showed he only planned to camp with Purcell and asked "anyone he could find for a ride" to the campsite; he demonstrated no clear motive or intent to rob Janine before he killed her; and the evidence that he robbed her was "minimal." As to the manner of killing, defendant claims that he strangled Janine suddenly because he used "whatever was at hand," and then fled the scene.

Defendant clearly ignores most, if not all, of the incriminating evidence presented at trial—to the point we question whether he is speaking about the same case. The evidence of his motive and planning was overwhelming. Defendant told the detectives that he needed money and a car to leave town to avoid the check forgery charges and that he decided to rob a friend—the easiest way to achieve his goal—and to kill that person. He further described the details of his original plan—to lure Smith into a motel room and hit him on the head from behind—and the details of his changed plans—to replace Smith with Janine when he could not catch Smith alone, and to lure Janine into the desert at night by pretending he needed a ride to a campsite in Odessa Canyon. (*People v. Silva, supra*, 25 Cal.4th 345, 369 ["murder's isolated location, selected by defendant, is itself evidence of planning"].) Smith confirmed that defendant had initially asked him for a ride and that, at defendant's request, he assured Janine that defendant needed a ride.

Defendant further described how he planned to kill Janine with cords that he had obtained ahead of time, how he and Purcell committed the crimes, and what they did afterwards. Their actions included placing Janine's body in the

trunk of the car, driving to another part of the canyon to dispose of the body, checking the body for money and to verify that Janine was dead, cashing one of Janine's checks, and fleeing the country. (See *People v. Perez* (1992) 2 Cal.4th 1117, 1128 [9 Cal.Rptr.2d 577, 831 P.2d 1159] [the defendant's search of drawers and jewelry boxes—rather than immediate flight from scene—supported premeditation and deliberation].) Krizo's testimony—that a young man and woman opened the trunk of a car which matched the description of Janine's car—corroborated defendant's portrayal of his and Purcell's actions after they had killed Janine.

As to manner of killing, the use of multiple weapons (cord, flashlight, and rocks)—supported by defendant's statements and the forensic evidence—reflected deliberation and premeditation rather than the result of a rash, impulsive act. (*People v. Steele* (2002) 27 Cal.4th 1230, 1250 [120 Cal.Rptr.2d 432, 47 P.3d 225] [killing the same way twice—victim strangled and stabbed multiple times—supported inference of calculated design to ensure death, rather than " 'unconsidered "explosion" of violence' "]; *People v. Bonillas* (1989) 48 Cal.3d 757, 792 [257 Cal.Rptr. 895, 771 P.2d 844] ["[l]igature strangulation is in its nature a deliberate act"].)

Defendant further argues that he presented evidence, through Dr. Crinella's testimony, of his inability to form the specific intent to kill. He claims that the prosecution never refuted that evidence, and that consequently, there was insufficient evidence that he intended to kill. However, the jury remained free to reject Dr. Crinella's testimony even if it was uncontradicted. (*People v. Johnson* (1992) 3 Cal.4th 1183, 1231–1232 [14 Cal.Rptr.2d 702, 842 P.2d 1].)

Moreover, Dr. Crinella's testimony did not strongly support a finding of no premeditation. Although Dr. Crinella opined that defendant was mentally ill and that his illness and mental disorders influenced his actions that led him to kill Janine, the doctor gave no opinion regarding defendant's intent when he committed the crimes. On cross-examination, Dr. Crinella conceded that defendant was not mentally retarded, that he knew right from wrong, that he had committed crimes for excitement or an "adrenaline rush," that he could have planned the robbery and murder for nearly a week beforehand, and that he likely found the planning process exciting. Defendant told Dr. Crinella that committing the murder gave him an "adrenaline rush" that lasted three days. The doctor further acknowledged that other doctors had reached different diagnoses, finding that defendant had a sociopathic or antisocial personality disorder.

Given the extensive evidence of premeditation and deliberation and the inconclusive evidence of mental disease or defect, the jury was entitled to reject the defense expert testimony. (*People v. Hernandez* (1988) 47 Cal.3d

315, 350–351 [253 Cal.Rptr. 199, 763 P.2d 1289].) Under all the circumstances, we find ample evidence of premeditation and deliberation.

### 2) Robbery Felony Murder; Robbery-murder Special-circumstance Finding

Again, ignoring his two confessions, defendant claims that there was *no* evidence that he intended to steal before or during the killing. He claims that the "total of the evidence regarding the crime of robbery" consisted of the fact he possessed Janine's checkbook, a forged check, and Janine's car *after* the homicide and that his only motive before the killing was to obtain a ride from Janine so that he and Purcell could go camping. Thus, he argues that, because the evidence showed that the robbery was merely incidental to the murder, the robbery felony-murder conviction and the robbery-murder special-circumstance finding were not supported by sufficient evidence. (*People v. Kipp* (2001) 26 Cal.4th 1100, 1128 [113 Cal.Rptr.2d 27, 33 P.3d 450]; *People v. Morris* (1988) 46 Cal.3d 1, 21 [249 Cal.Rptr. 119, 756 P.2d 843], disapproved on other grounds in *In re Sassounian* (1995) 9 Cal.4th 535, 543, fn. 5 [37 Cal.Rptr.2d 446, 887 P.2d 527].)

To the contrary, the same evidence that established defendant intentionally killed Janine with deliberation and premeditation also established that he killed her while committing a robbery.[5] (See *ante*, at pp. 850–851; *People v. Hillhouse, supra*, 27 Cal.4th at p. 500 [sufficient evidence that killing accompanied by intent to steal where the defendant stated victim had money and he was going to kill him and take it].) Further, when arrested, defendant was driving Janine's car and possessed her checkbook and one of her checks made out to himself. (*People v. Hughes* (2002) 27 Cal.4th 287, 357 [116 Cal.Rptr.2d 401, 39 P.3d 432] [sufficient evidence that the defendant harbored larcenous intent before or during use of force where the defendant stole victim's wallet and cashed one of her checks shortly after killing].) Consequently, there is sufficient evidence to support a first degree robbery felony-murder conviction and the robbery-murder special-circumstance finding.[6]

### b. Lying-in-wait Special-circumstance Finding'

Defendant contends that the evidence was insufficient to support the lying-in-wait special-circumstance finding because he was not physically

---

[5] Defendant contends that his confessions cannot supply the necessary elements for the robbery component of felony murder and the robbery-murder special circumstance. However, the corpus delicti rule does not apply to proof of the underlying felony for purposes of felony murder or the robbery-murder special circumstance. (§ 190.41; see *People v. Ray, supra*, 13 Cal.4th at p. 341, fn. 13.)

[6] Premised on the claim there was insufficient evidence of a robbery felony murder, defendant argues that the trial court incorrectly instructed on first degree felony murder. Because his premise lacks merit, his dependent argument fails.

concealed in the car, and the lying-in-wait period was disrupted when the occupants briefly stepped from the car. He is wrong.

■ " 'The lying-in-wait special circumstance requires "an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage . . . ." [Citations.] "The element of concealment is satisfied by a showing ' "that a defendant's true intent and purpose were concealed by his actions or conduct. It is not required that he be literally concealed from view before he attacks the victim." ' " [Citation.]' (*People v. Carpenter* (1997) 15 Cal.4th 312, 388 [63 Cal.Rptr.2d 1, 935 P.2d 708].)" (*People v. Hillhouse, supra,* 27 Cal.4th at p. 500.)

The evidence amply supports the lying-in-wait special-circumstance finding. To carry out his plan to rob and kill Janine, defendant devised a ruse about needing a ride to a campsite in Odessa Canyon to meet a fictitious friend, John. Using this ruse, he tricked Janine into giving him a ride. As Janine drove defendant and Purcell to the desert, defendant sat in the backseat behind Janine, with both cords that he had obtained earlier, waiting for an opportune time to strangle her. When they reached the canyon, defendant saw a trailer and pretended that it belonged to John. Although they started walking towards the trailer, they returned to the car and drove to the trailer after defendant saw that a road led to it. As Janine drove to the trailer, defendant, who was again seated in the backseat behind her, removed the electrical cord from his pocket and wrapped it around his wrists. After Janine parked the car, defendant—from his position of advantage—surprised her by placing the electrical cord over her head and strangling her. Substantial evidence supports the jury's finding.[7] (*People v. Morales, supra,* 48 Cal.3d at p. 555 [sufficient evidence of lying in wait where the defendant sat behind victim in car, waited

---

[7] Relying on *Domino v. Superior Court* (1982) 129 Cal.App.3d 1000 [181 Cal.Rptr. 486], defendant argues that the evidence was insufficient to support the special circumstance allegation because the "temporal relationship" between the killing and the lying in wait was "disrupted." *Domino* stated "the killing must take place during the period of concealment and watchful waiting or the lethal acts must begin at and flow continuously from the moment the concealment and watchful waiting ends. If a cognizable interruption separates the period of lying in wait from the period during which the killing takes place, the circumstances calling for the ultimate penalty do not exist." (*Id.* at p. 1011.) As was the case in *People v. Morales* (1989) 48 Cal.3d 527, 558 [257 Cal.Rptr. 64, 770 P.2d 244]: "We need not consider the validity of *Domino*'s restrictive interpretation of the special circumstance provision [citation], because the evidence in this case clearly would support a finding that defendant's lethal acts flowed continuously from the moment he commenced his surprise attack." Here, there was one continuous lying-in-wait period during which defendant surprised and killed Janine. (*People v. Hillhouse, supra,* 27 Cal.4th at p. 501 [" '[a]s long as the murder is immediately preceded by lying in wait, the defendant need not strike at the first available opportunity, but may wait to maximize his position of advantage before taking his victim by surprise.' [Citation.]".)

until car was in more deserted location, and then strangled and bludgeoned her].)

### 4. *Alleged Prosecutorial Misconduct*

During closing argument, the prosecutor stated: "I want you to focus on why [Dr.] Crinella was here. Crinella was here for a limited purpose. There's an instruction to tell you about it. That limited purpose is if because of [defendant's] mental disease, defect, etcetera, it impaired him in such a way that he couldn't form the specific intent or mental states required for these crimes, then he's not guilty, he walks. That's what we have. If, based on Dr. Crinella's testimony, you believe that he couldn't form the intent to rob somebody, he's not guilty."

Focusing on the last sentence above, defendant argues that the prosecutor incorrectly told the jury that, if they believed the defense evidence as it relates to first degree felony murder, the only option would be to set him free without considering how the evidence related to other crimes. Defendant contends that this misstatement of the law constituted prosecutorial misconduct, violating his right to due process. However, defense counsel did not object to the challenged statement or request an admonition. Because an objection and admonition could have cured any harm, the contention is not cognizable on appeal. (*People v. Maury, supra,* 30 Cal.4th at p. 418.)

In any event, we would not be required to reverse defendant's conviction on the alleged basis. Viewing the prosecutor's comments in the context of the argument as a whole, we do not find it reasonably likely that the jury would have construed or applied the complained-of remarks in an objectionable manner. (*People v. Samayoa* (1997) 15 Cal.4th 795, 841 [64 Cal.Rptr.2d 400, 938 P.2d 2].)

First, defendant reads too much into the prosecutor's comment. Immediately before that comment, the prosecutor correctly stated that if the jury believed any mental disease or defect "impaired him in such a way that he couldn't form the specific intent or mental states required for these *crimes,* then he's not guilty, he walks." The trial court instructed on the theories of first degree premeditated murder, first degree felony murder with robbery as the underlying felony, and the lesser included offenses of second degree murder based on either express or implied malice. All of these offenses are specific intent crimes and, with the exception of felony murder and robbery, require malice aforethought. (See CALJIC Nos. 8.10, 8.11, 8.20, 8.21, 8.30, 8.31, 9.40.)

The trial court further instructed the jury that it could consider the evidence regarding mental disease, mental defect, or mental disorder in determining

whether defendant had the required mental states for *both* first and second degree murder (CALJIC No. 3.32). "In a murder case, if this evidence is believed, the only supportable verdict would be involuntary manslaughter or an acquittal." (*People v. Saille* (1991) 54 Cal.3d 1103, 1117 [2 Cal.Rptr.2d 364, 820 P.2d 588].) Involuntary manslaughter was not an option in this case. Thus, the prosecutor correctly related that defendant would be entitled to an acquittal if the jury believed defendant had not formed the specific intent or mental states necessary to commit the crimes. The further comment—"If, based on Dr. Crinella's testimony, you believe that he couldn't form the intent to rob somebody, he's not guilty"—was not inaccurate; in that case, defendant would not have been guilty of first degree felony murder.

Second, if the jury had had any doubt as to the meaning of the challenged comment, the remaining arguments clarified it. In his closing argument, defense counsel told the jury it could consider Dr. Crinella's testimony in determining whether defendant "actually formed the required specific intent, premeditated, deliberated, or harbored malice aforethought." Counsel further argued:

"[The prosecutor] I believe was suggesting to you—and I may have misunderstood, I'll certainly yield to your understanding—that if you adopted this interpretation, [defendant] would walk right out the door. And I dispute that. No one is suggesting that in the least. And no one is suggesting that that is going to happen.

"But when it comes to weighing the evidence, which we don't dispute it, in weighing the history, the diagnosis, regarding [defendant's] mental defects, mental diseases, those are certainly things you should consider in determining whether this offense was of the first or of the second degree."

In his rebuttal argument, the prosecutor clarified that second degree murder required that defendant form the mental state of malice aforethought and that defendant could "walk" if the jury found that his alleged mental illness or defect precluded him from harboring malice. Thus, the prosecutor only argued that defendant would walk if the jury concluded he did not form the mental states necessary for both first and second degree murder. Contrary to defendant's claim, there is no reasonable likelihood that the jury construed the prosecutor's remarks to mean that "they had no choice but to convict [defendant] of first degree murder or else he would be 'set free.'"

### 5. Instructional Issues

#### a. Failure to Instruct on Theft as a Lesser Included Offense of Robbery

Defendant contends that the trial court erred in failing to instruct the jury sua sponte on theft as a lesser included offense of robbery. Although theft is a lesser included offense of robbery (*People v. Turner* (1990) 50 Cal.3d 668, 690 [268 Cal.Rptr. 706, 789 P.2d 887]), defendant was not charged with robbery. Accordingly, the trial court did not have a sua sponte duty to instruct the jury on theft as a lesser included offense, because the robbery formed the basis for the felony-murder charge and the special circumstance allegation. (*People v. Cash* (2002) 28 Cal.4th 703, 737 [122 Cal.Rptr.2d 545, 50 P.3d 332]; *People v. Silva, supra,* 25 Cal.4th at p. 371.)

In any event, because there was no evidence that defendant abandoned the intent to steal and killed Janine for a reason independent of theft, the trial court would not have had to instruct sua sponte on theft even if robbery had been charged. (See *People v. Sakarias* (2000) 22 Cal.4th 596, 620 [94 Cal.Rptr.2d 17, 995 P.2d 152] [no sua sponte duty to instruct on theft; neither the defendant's statements nor his actions showed he abandoned intent to steal].)

#### b. CALJIC No. 8.11

The trial court instructed the jury on the definitions of express and implied malice (CALJIC No. 8.11).[8] Defendant claims that the court violated his right to due process by giving the implied malice instruction because it permitted the jury to find him guilty of first degree murder based on implied malice. He is wrong.

In addition to instructing on the first degree murder theories of deliberate, premeditated murder and felony murder, the trial court instructed on the lesser included offenses of second degree murder based on express and implied malice. In regard to the implied malice second degree murder offense, the court gave CALJIC No. 8.31, which stated: "Murder of the second degree is also the unlawful killing of a human being when: [¶] 1. The

---

[8] The trial court defined express and implied malice as follows:

"Malice may be either express or implied. Malice is express when there is manifested an intention unlawfully to kill a human being. Malice is implied when:

"1. The killing resulted from an intentional act;

"2. The natural consequences of the act are dangerous to human life; and

"3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life."

killing resulted from an intentional act; [¶] 2. The natural consequences of the act are dangerous to human life; and [¶] 3. The act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. [¶] When the killing is the direct result of such an act, it is not necessary to establish that the defendant intended that his act would result in the death of a human being." Because the definition of second degree murder, as given in CALJIC No. 8.31, included the element of implied malice, as defined in CALJIC No. 8.11, the jury was informed that the implied malice instruction applied to the offense of second degree murder.

On the other hand, the trial court instructed that first degree premeditated murder required a "willful, deliberate and premeditated killing with express malice." (CALJIC No. 8.20.) The instruction continued to emphasize the intent to kill requirement. The court then instructed that first degree felony murder required only a specific intent to commit the underlying felony of robbery and that the unlawful killing could be unintentional or accidental. (CALJIC No. 8.21.) Thus, the instructions as a whole clearly conveyed to the jury that implied malice did not apply to either first degree deliberate, premeditated murder or to felony murder. (*People v. Cain* (1995) 10 Cal.4th 1, 36 [40 Cal.Rptr.2d 481, 892 P.2d 1224].)

Finally, the verdicts revealed that the instructions did not mislead the jury. In finding the lying-in-wait special-circumstance allegation true, the jury found that defendant intentionally killed the victim. It thus necessarily found express, not implied, malice. In finding the robbery felony-murder special-circumstance allegation true, the jury found that defendant murdered the victim while engaged in the commission of robbery. Thus, there was no reasonable likelihood that the jury misunderstood the instructions as a whole. (*People v. Cain, supra,* 10 Cal.4th at p. 36.)

B. *Penalty Phase Issues*

1. *Admissibility of Unadjudicated Acts of Misconduct and Prior Juvenile Adjudications for Robbery*

Defendant claims that: (1) admission of unadjudicated acts of misconduct in jail was improper factor (b) evidence (§ 190.3, factor (b)) and (2) admission of his prior juvenile adjudications for robbery was improper factor (c) evidence (§ 190.3, factor (c)). He is wrong.

a. *Evidence of Defendant's Possession of Sharpened Instruments in Jail*

During the penalty phase, the prosecution introduced evidence that, while in custody in county jail on this case, on three separate occasions defendant

possessed weapons and used them to threaten deputies. To prove the three jail incidents, the prosecutor presented the testimony of jail personnel.

During the first jail incident, on February 19, 1992, defendant was yelling angrily and hitting the cell door with his head, feet, and fists. He produced two homemade knives, known as "shanks." One was seven inches long and made of metal, while the other one was made from a toothbrush with an attached razor blade. As the deputies stood outside the cell, defendant took a defensive stance. While he made waving and jabbing motions with the shanks, defendant dared the deputies, "Which one do you want? Come on in and get it." After the deputies called for a stun gun, defendant superficially cut his wrist with the toothbrush shank. Defendant pointed the other shank towards his eye and asked, "Do you want to see me do it?" When the deputies failed to respond, defendant stabbed himself in the elbow area.

During the second jail incident, on August 13, 1992, defendant refused to go to court for a scheduled appearance. He had barricaded himself in his cell by placing a mattress, trash can, and other items against the bars and had dumped water on the floor to make it slippery. Defendant wore a "Rambo-type" outfit; he had wrapped torn pieces of a sheet around his arms, apparently to protect himself from stun guns. He held a razor blade in his mouth, while another hung from his clothes. A sharpened broom handle was inside the cell. Defendant's face was smeared with blood, in the manner of war paint. Defendant told the deputies that he would fight them if they came inside and tried to take him to court.

When one of the deputies tried to calm him, defendant took the razor blade from his mouth and began cutting his knuckles. He punched his hands against each other and made karate-like gestures. A sergeant was called to the cell. Defendant reiterated that he was not going to court, that the deputies would have to come in and get him, and that if they did, there would be a fight. To defuse the situation, the sergeant assured defendant he was not going to court because he needed medical treatment for his knuckles. Defendant continued to challenge the sergeant to fight. Eventually, the sergeant convinced defendant he was not going to court; defendant then surrendered without incident.

During the third incident, on December 8, 1992, defendant threatened deputies again with homemade weapons. The incident began after the jail psychiatrist issued a removal order to remove defendant from UB (unusual behavior) status and return him to the general jail population. The psychiatrist believed that defendant was malingering by faking psychotic behavior.

To prevent the deputies from transporting him, defendant blocked off the stairway to the upper cells by wrapping torn bed sheets across the railing.

Again wearing a Rambo-type outfit and with blood smeared on his face like war paint, defendant held a razor blade shank and a mace-like weapon made of hard soap wrapped inside strips of a bed sheet. Swinging the mace-like weapon around and making stabbing motions with the shank, defendant stood in an aggressive stance, dared the deputies to come in and get him, and said he was trained in the martial arts and would hurt anyone who came into the area. He refused to be moved to the general jail population. When more deputies arrived, the situation escalated, with defendant continuing to threaten them. Defendant finally surrendered his weapons after the deputies agreed to let him remain in the UB unit for the night while they evaluated his situation.

### b. *Evidence of Prior Juvenile Adjudications for Robbery*

At the penalty phase, the prosecution introduced evidence that, when defendant was a juvenile, he had committed two separate armed robberies on February 3 and February 9, 1984. To prove the February 3 robbery, the prosecutor presented the victim's testimony and certified juvenile court records showing defendant's admission to the crime. To prove the February 9 robbery, the prosecutor presented only the certified juvenile court records showing the facts of the case and defendant's admission to the crime. The victim had since died.

### c. *Discussion*

Section 190.3, factor (b), permits the penalty phase jury to consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." " 'Evidence of prior criminal behavior is relevant under section 190.3, factor (b) if it shows "conduct that demonstrates the commission of an actual crime, specifically, the violation of a penal statute . . . ." ' [Citations.]" (*People v. Hughes, supra,* 27 Cal.4th at p. 382.)

On appeal, defendant argues that admission of the unadjudicated jail activity was improper section 190.3, factor (b) evidence because there was no showing of violence—except against himself—and his behavior did not constitute a crime. The trial court correctly concluded otherwise. At an Evidence Code section 402 hearing before the beginning of the penalty phase, the prosecutor presented testimony regarding the three jail incidents. Defendant made the same argument that he makes now. The prosecutor countered that possession of deadly weapons in jail, coupled with threats of force or violence, was clearly criminal activity under section 190.3, factor (b). The court overruled defendant's objection. It found that the evidence showed that defendant possessed weapons in jail and threatened to use force or violence

against the deputies to get what he wanted and that his conduct qualified as violent criminal activity under section 190.3, factor (b). The court further found that the probative value of the evidence outweighed the prejudicial effect under Evidence Code section 352. Accordingly, after closing argument, the court instructed on the elements of unlawful possession of a deadly weapon in jail, pursuant to section 4574.[9]

■ The trial court's ruling was clearly correct. (See *People v. Hughes, supra,* 27 Cal.4th at pp. 382–383 [possession of shank in jail violated section 4574, qualifying as implied threat of violence under section 190.3, factor (b)]; *People v. Tuilaepa, supra,* 4 Cal.4th at pp. 588–589 [possession of razor blades in California Youth Authority; same]; see also *People v. Kipp, supra,* 26 Cal.4th at pp. 1133–1134 [verbal threats against deputy sheriff relevant to violent potential of the defendant's criminal conduct].)

■ Defendant further argues that admission of the docket sheet to prove the fact of the juvenile adjudication for the February 9, 1984, robbery was improper section 190.3, factor (c) evidence. As the Attorney General points out, the trial court admitted the evidence under section 190.3, factor (b), not factor (c).[10] Although evidence of violent juvenile adjudications is not admissible under section 190.3, factor (c), such evidence is admissible under factor (b). (*People v. Hayes* (1990) 52 Cal.3d 577, 632–633 [276 Cal.Rptr. 874, 802 P.2d 376]; *People v. Lucky* (1988) 45 Cal.3d 259, 294–295 [247 Cal.Rptr. 1, 753 P.2d 1052].)

Relying on *People v. Champion* (1995) 9 Cal.4th 879, 937 [39 Cal.Rptr.2d 547, 891 P.2d 93], defendant suggests that admission of juvenile court records to establish the fact of the juvenile adjudication is inadmissible section 190.3, factor (b) evidence. However, since *Champion,* we have found that the fact of an adjudication or conviction is admissible to establish "criminal activity" under section 190.3, factor (b). (*People v. Scott* (1997) 15 Cal.4th 1188, 1222–1223 [65 Cal.Rptr.2d 240, 939 P.2d 354]; *People v. Jackson* (1996) 13 Cal.4th 1164, 1234 [56 Cal.Rptr.2d 49, 920 P.2d 1254]; *People v. Ray, supra,* 13 Cal.4th 313, 367–369 & fn. 2 (conc. opn. of George, C. J.).)

In any event, any error was harmless. The jury was presented with properly admitted evidence in aggravation that showed a pattern of nonconforming and violent behavior: the circumstances of the crime evidencing a deliberate,

---

[9] Section 4574, subdivision (a), provides in relevant part, that "any person who, while lawfully confined in a jail . . . possesses therein any . . . deadly weapon, . . . is guilty of a felony."

[10] At trial, defendant argued that the prosecutor could use only live testimony, not certified copies of court records, to prove violent criminal conduct under section 190.3, factor (b). The trial court ruled otherwise.

premeditated murder of an acquaintance for money in a brutal, cold-blooded, and devious manner; the circumstances of the February 3, 1984, juvenile robbery; the three incidents involving possession of dangerous weapons in jail; and four prior felony convictions. There is no reasonable possibility the penalty verdict would have been different absent evidence of the February 9, 1984, robbery. (*People v. Tuilaepa, supra,* 4 Cal.4th at p. 591.)

## 2. Issues Relating to Dr. Oshrin

### a. Production of Dr. Oshrin's Report

During the early stages of the criminal proceeding and at defense counsel's request, Dr. Oshrin, a psychiatrist, performed a psychiatric examination of defendant. In addition to reviewing defendant's record, Dr. Oshrin interviewed defendant on November 23, 1990. He then produced a report, dated November 24, 1990, which he gave to defense counsel.

The prosecutor moved for discovery of defense materials relating to the penalty phase, pursuant to section 1054.3. The trial court granted the discovery motion. Defendant contends that the trial court's discovery order was improper because it required him to divulge information about witnesses whom the defense did not intend to call at trial. Specifically, he complains that, even though he did not intend to call Dr. Oshrin as a witness during the penalty phase, the discovery order improperly allowed the prosecution access to Dr. Oshrin's report containing privileged defense information. He alleges that the prosecution's obtaining that report violated the attorney work product doctrine, his attorney-client and psychotherapist-patient privileges, and his privilege against self-incrimination. However, no factual basis supports defendant's claim.

First, contrary to defendant's assertion, the discovery order did *not* require the defense to produce any information about witnesses whom the defense did not intend to call at trial. The prosecution requested: (1) "the names and addresses of persons, other than the defendant, who[m] counsel or defendant *intends to call as witnesses at trial*"; (2) "any relevant written or recorded statements of [those] persons . . . and/or reports of the statements of such persons, or videotapes"; and (3) "any reports or statements of experts made in connection with this case, including, but not limited to, the results of physical or mental examinations, scientific tests, experiments, or comparisons which the defendant or counsel *intend to offer as evidence at the trial* of this case."[11]

Defense counsel represented that the defense had not yet decided which expert witnesses it planned to call during the penalty phase. The trial court

---

[11] The prosecution's discovery motion essentially tracked the language of section 1054.3.

granted the prosecution's motion with the express caveat that the defense need not reveal the identity of and information about any medical expert until it had actually decided to call the particular witness. The court stated that the defense could reveal the identity of its expert witness on the very morning it planned to call the expert, but if that occurred, the prosecution would be entitled to a continuance. Thus, the record does not support defendant's claim that the "court made a blanket discovery order that included *all* expert reports."

Second, contrary to defendant's assertion, the prosecution's acquisition of Dr. Oshrin's report did not "result" from the discovery order. In other words, the prosecution did *not* obtain the report through the enforcement of the discovery order. Instead, defendant voluntarily produced Dr. Oshrin's report during the recess between the direct and cross-examinations of Dr. Crinella at the guilt phase. During direct examination, Dr. Crinella testified that he had considered various reports, including Dr. Oshrin's November 24, 1990, report, in evaluating defendant and forming his opinions regarding defendant's mental state. Apparently, up until that point, the prosecutor had been unaware of Dr. Oshrin's evaluation or report. During the recess, defense counsel provided the prosecutor a copy of Dr. Oshrin's full report. Without objection, the prosecutor used the report to cross-examine Dr. Crinella. During cross-examination, Dr. Crinella acknowledged that, although he had concluded that defendant showed signs of brain damage, schizophrenia, and borderline personality disorder, Dr. Oshrin had reached a different diagnosis. Dr. Oshrin did not find that defendant suffered from any organic problems, but instead concluded that he probably had an antisocial personality disorder. Dr. Crinella conceded that defendant's history was consistent with that disorder.

We presume that defense counsel provided Dr. Oshrin's report because he knew that the prosecutor was entitled to cross-examine Dr. Crinella about its contents. (See Evid. Code, §§ 721, subd. (a), 1016, subd. (a); *People v. Coleman* (1989) 48 Cal.3d 112, 151 [255 Cal.Rptr. 813, 768 P.2d 32]; *People v. Milner* (1988) 45 Cal.3d 227, 241 [246 Cal.Rptr. 713, 753 P.2d 669] [attorney-client privilege and work product doctrine inapplicable to matters relied on or considered in the formation of defense expert witness's opinion]; *People v. Campos* (1995) 32 Cal.App.4th 304, 308 [38 Cal.Rptr.2d 113]; *Woods v. Superior Court* (1994) 25 Cal.App.4th 178, 186 [30 Cal.Rptr.2d 182].) In any event, by voluntarily turning over the report and failing to object to the prosecutor's using it during cross-examination, defendant waived any claim that the production and use of the report violated the attorney work product doctrine, the attorney-client and psychotherapist-patient privileges, and the privilege against self-incrimination. (Evid. Code, § 912; *People v. Poulin* (1972) 27 Cal.App.3d 54, 64 [103 Cal.Rptr. 623].)

In sum, the trial court did not order the disclosure of the names and reports of all experts who had been retained by defendant, regardless of their status as intended witnesses, nor did the discovery order require the defense to give the prosecution Dr. Oshrin's report. Thus, defendant's claim of error must fail.

### b. *Dr. Oshrin—Prosecution Rebuttal Witness*

During the penalty phase, the defense called Dr. Crinella and Dr. Fischer as expert witnesses and marked Dr. Oshrin's report as an exhibit for identification. Both doctors testified that they had read and considered Dr. Oshrin's full report and had relied on portions of it in forming their opinions. Dr. Crinella discussed and disclosed significant portions of Dr. Oshrin's report during his testimony, including some of defendant's statements to Dr. Oshrin. Dr. Crinella also read two paragraphs of the report into the record, and defense counsel provided the jury with copies of those two paragraphs during the doctor's direct examination. Defense counsel marked the full report as an exhibit for identification. Without objection, the prosecutor used the full report in cross-examining both doctors.

Over defendant's objection, the trial court later permitted the prosecutor to call Dr. Oshrin as a rebuttal witness. After both parties rested, the trial court, on defendant's motion, admitted Dr. Oshrin's full report into evidence.

Defendant claims that the trial court, in allowing the prosecutor to call Dr. Oshrin as a rebuttal witness, violated his attorney-client and work product privileges and his United States Constitution Fifth Amendment privilege against self-incrimination. Defendant argues that the substantive content of Dr. Oshrin's report, including the communications between him and the doctor, was privileged information that could only be waived if the defense called Dr. Oshrin as a witness. At most, the prosecutor could cross-examine Dr. Crinella only on the parts of the report on which he relied in forming his opinions, and with which he presumably agreed. We reject the claim.

Defendant has forfeited his appellate claim because he asserted only his psychotherapist-patient privilege at trial. Defendant objected to Dr. Oshrin's testimony on the ground that the court had appointed the doctor as a confidential mental health expert to advise defense counsel on possible mental defenses under Evidence Code section 1017.[12] The prosecutor argued

---

[12] As relevant here, Evidence Code section 1017, subdivision (a), provides that: "There is no privilege under this article if the psychotherapist is appointed by order of a court to examine the patient, but this exception does not apply where the psychotherapist is appointed by order of the court upon the request of the lawyer for the defendant in a criminal proceeding in order to provide the lawyer with information needed so that he or she may advise the defendant

that Dr. Crinella and Dr. Fischer had used Dr. Oshrin's report in forming their opinions and that defendant, by placing his mental state in issue at the guilt and penalty phases of trial, had waived his psychotherapist-patient privilege. Defense counsel responded that placing defendant's mental state in issue did not waive "the confidentiality accorded to appointments under Evidence Code section 1017." Counsel contended that, although the experts had read and considered Dr. Oshrin's full report, they only adopted and relied on two paragraphs, which had been read to the jury; thus, defendant had only waived confidentiality as to those two paragraphs.

The trial court allowed the prosecutor to call Dr. Oshrin as a rebuttal witness. It ruled that, because defendant placed his mental or emotional condition in issue, and because several defense mental health experts considered or relied on Dr. Oshrin's report, defendant had waived his section 1017 psychotherapist-patient privilege under Evidence Code section 912. Thus, defendant cannot belatedly claim on appeal that the trial court's ruling violated his attorney-client, or Fifth Amendment privileges or the attorney work product doctrine. (Evid. Code, § 912, subd. (a); *People v. Clark* (1990) 50 Cal.3d 583, 626 [268 Cal.Rptr. 399, 789 P.2d 127]; *Woods v. Superior Court, supra,* 25 Cal.App.4th at p. 187; *People v. Poulin, supra,* 27 Cal.App.3d at p. 64.)

In any event, defendant's claim lacks merit. Defendant waived any protections that the attorney-client privilege, the attorney work product doctrine, and the privilege against self-incrimination afforded him regarding all matters that Dr. Crinella and Dr. Fischer considered or on which they relied, including Dr. Oshrin's report. (See *People v. Coleman, supra,* 48 Cal.3d at pp. 151–152; *People v. Milner, supra,* 45 Cal.3d at p. 241; see also Evid. Code, §§ 721, subd. (a), 912, subd. (a).) Moreover, by placing his mental state in issue, defendant waived his psychotherapist-patient privilege (which he concedes he waived) and his privilege against self-incrimination. (*People v. Clark, supra,* 5 Cal.4th at pp. 1005, 1007–1008; *People v. Montiel* (1993) 5 Cal.4th 877, 923 [21 Cal.Rptr.2d 705, 855 P.2d 1277].) Because defendant had waived these privileges in regard to Dr. Oshrin's report, the prosecutor was free to call Dr. Oshrin as a rebuttal witness and to question him about that report. (Evid. Code, § 804, subd. (a); *Mosesian v. Pennwalt Corp.* (1987) 191 Cal.App.3d 851, 862 [236 Cal.Rptr. 778], disapproved on other grounds in *People v. Ault* (2004) 33 Cal.4th 1250, 1272, fn. 15 [17 Cal.Rptr.3d 302, 95 P.3d 523] [when expert testifies that opinion based in whole or in part on another's opinions, other person may be called as rebuttal witness].) Accordingly, the trial court did not err in permitting Dr. Oshrin to testify as a prosecution rebuttal witness.

whether to enter or withdraw a plea based on insanity or to present a defense based on his or her mental or emotional condition."

### 3. *Testimony of Defendant's Former Attorney*

Deputy Public Defender John Sullivan represented defendant in the 1990 check forgery case. Over defendant's objection, the trial court permitted Sullivan to testify for the prosecution. Defendant claims that Sullivan's testimony violated his attorney-client privilege. He is wrong.

During the guilt phase of trial, the prosecutor informed the court that he wished to call Sullivan to testify that on October 23, 1990—the day before Janine's murder—he requested a two-week continuance in the check forgery case because defendant had retained a private attorney. The prosecutor theorized that defendant asked for the continuance, having already planned to rob and kill Janine and then leave town. Defense counsel objected on the ground that the attorney-client privilege protected communications between defendant and Sullivan and that other witnesses, such as the clerk or court reporter, could certify the transcript as a public record. When the court asked if defendant's main objection was based on the attorney-client privilege, defense counsel replied, "The privilege other than what is on the record." Counsel further asserted that "the transcript, if properly authenticated, is indeed the best evidence here."

When questioned by the trial court, Sullivan asserted that he would testify only about what he had said in court. He stated that, "anything other than what I said in court I would assert the privilege to the court. In other words, if further inquiry as to what information that I had received, I would have to assert the privilege as confidential communication." When asked if defendant still objected, defense counsel stated, "Yes. I believe the proper foundation of witnesses is the court reporter." The trial court overruled defendant's objection, finding that the proferred evidence "can be proved several ways." It further ruled that Sullivan could only testify about "what happened in open court on October 23, 1990, that's contained in Exhibit 7 [transcript of proceedings]."

Sullivan authenticated the hearing transcript and testified only as to matters within it. He stated that he appeared on October 23, 1990, as defendant's attorney in a check forgery case to set the date for the preliminary hearing, that he requested a two-week continuance "for a new lawyer to take over the case," and that defendant himself told the judge that he had hired another attorney.

As is evident from the above proceedings, Sullivan did *not* testify about any confidential communications between him and defendant. (See Evid. Code, §§ 952, 954 [attorney-client privilege pertains to a " 'confidential communication between client and lawyer' "].) "Because this information

was of public record no confidential information was elicited by the prosecution which violated the attorney-client privilege." (*People v. Gillard* (1997) 57 Cal.App.4th 136, 162 [66 Cal.Rptr.2d 790].) Accordingly, we reject defendant's claim that his attorney-client privilege was violated.

### 4. *Alleged Prosecutorial Misconduct*

Defendant claims that the prosecutor committed misconduct and violated his Fifth and Fourteenth Amendment rights under the United States Constitution in claiming during the penalty phase closing argument that the jury could consider his lack of remorse for Janine's killing. We reject this argument.

Over defendant's objection, the prosecutor argued the following:

"Another thing you can think about and you can consider, if you haven't already, is whether or not the defendant has shown any remorse. And by that I mean in the crime area.

"What do we have? November 2nd he's arrested, he's interviewed on tape. You heard the tape. I pulled it out. If you want to listen to it, you listen to it. Ten, twelve days after the murder. On that tape does he show any signs of remorse for the brutal murder? No. You listen to the tape. Things are said.

" 'How do you feel now that it's over?'

" 'I don't know what you mean. It wasn't worth it just for the car.'

"The discussion about money and, 'What's a human life worth to you?' His response—and I can still remember that—'Janine? 5-to-10,000.' Janine, 5-to-10,000. Sort of like squashing a cockroach. Didn't mean a thing. Only thing he's upset about is he didn't get any money."

■ No misconduct or constitutional error occurred. " '[R]emorse is universally deemed a factor relevant to penalty. The jury, applying its common sense and life experience, is likely to consider that issue in the exercise of its broad constitutional sentencing discretion no matter what it is told.' [Citation.]" (*People v. Bemore* (2000) 22 Cal.4th 809, 854–855 [94 Cal.Rptr.2d 840, 996 P.2d 1152].) "A prosecutor may properly comment on a defendant's lack of remorse, as relevant to the question of whether remorse is present as a mitigating circumstance, so long as the prosecutor does not suggest that lack of remorse is an aggravating factor. [Citations.]" (*People v. Mendoza* (2000) 24 Cal.4th 130, 187 [99 Cal.Rptr.2d 485, 6 P.3d 150].)

Defendant concedes that the prosecutor did not state that the jury could consider his lack of remorse as an aggravating factor. However, he argues

that the prosecutor's statements after commenting about his lack of remorse "suggested" that it was an aggravating circumstance. To the contrary, the prosecutor never suggested that the jury should consider defendant's lack of remorse as an aggravating circumstance. He simply reminded the jury that Janine had been brutally murdered and argued that, when the jury considered all the evidence, aggravating evidence so substantially outweighed mitigating evidence that the jury could reach only one verdict—death.

Nor did the prosecutor's remarks call attention, either directly or indirectly, to defendant's failure to testify or to his prearrest silence in circumstances in which it might implicate his exercise of the privilege against self-incrimination. (*People v. Williams* (1988) 44 Cal.3d 883, 966 [245 Cal.Rptr. 336, 751 P.2d 395] [comment on lack of remorse during confession invaded no constitutional right or privilege]; see also *People v. Holt* (1997) 15 Cal.4th 619, 691 [63 Cal.Rptr.2d 782, 937 P.2d 213] [comment on lack of remorse not improper; it was "clearly directed to the opportunities defendant had to express remorse in his statement to the police"].) We likewise reject defendant's federal due process claim. (See *People v. Frye* (1998) 18 Cal.4th 894, 1021 [77 Cal.Rptr.2d 25, 959 P.2d 183].)

### 5. *Challenges to the Death Penalty Law*

Defendant challenges California's death penalty law for reasons previously rejected by this court in other cases. He raises no basis for reconsideration of these rulings.

██ Specifically, the jury need not make written findings and reasons for the jury's death verdict, achieve unanimity as to specific aggravating circumstances, or find beyond a reasonable doubt (1) that the aggravating circumstances outweigh mitigating circumstances or (2) that death is the appropriate penalty. (*People v. Maury, supra,* 30 Cal.4th at p. 440; *People v. Hillhouse, supra,* 27 Cal.4th at p. 510.) ██ The trial court did not err: (1) in failing to identify which factors are aggravating and which are mitigating; (2) in failing to delete allegedly inapplicable mitigating factors of section 190.3 from the standard instructions, if the jury, as here, was properly instructed to consider and be guided by all factors "if applicable," because we assume it properly followed the instruction and concluded that mitigating factors not supported by evidence were simply not applicable; or (3) in using the word "extreme" in section 190.3, factor (d). (*People v. Maury, supra,* 30 Cal.4th at pp. 439–440, 443–444; *People v. Hughes, supra,* 27 Cal.4th at pp. 404–405; *People v. Welch* (1999) 20 Cal.4th 701, 768–769, 772–773 [85 Cal.Rptr.2d 203, 976 P.2d 754]; *People v. Cooper* (1991) 53 Cal.3d 771, 843 [281 Cal.Rptr. 90, 809 P.2d 865].) ██ Because the jury was instructed on miscellaneous sympathy evidence under section 190.3, factor (k), "[t]he

temporal language in section 190.3, factors (d) and (h) (consideration of any extreme mental or emotional disturbance or impairment from mental disease or defect or the effects of intoxication *at the time of the offense*), [does] not preclude the jury from considering any such evidence merely because it did not relate specifically to defendant's culpability for the crimes committed."[13] (*People v. Hughes, supra,* at p. 405, fn. 33.)

■ The trial court need not instruct the jury that there is a " 'presumption of life.' " (*People v. Kipp, supra,* 26 Cal.4th at p. 1137; See *People v. Carpenter* (1999) 21 Cal.4th 1016, 1064 [90 Cal.Rptr.2d 607, 988 P.2d 531].) **(21)** Because of the individual and normative nature of the jury's sentencing determination, the trial court need not instruct that the prosecution has the burden of persuasion on the issue of penalty. (*People v. Kipp, supra,* 26 Cal.4th at p. 1137; *People v. Bemore, supra,* 22 Cal.4th at p. 859.) ■ Prosecutorial discretion in deciding whether to seek the death penalty does not render the law unconstitutional. (*People v. Steele, supra,* 27 Cal.4th at p. 1269.) ■ Intercase proportionality review is not required. (*People v. Lewis* (2001) 26 Cal.4th 334, 394–395 [110 Cal.Rptr.2d 272, 28 P.3d 34]; *People v. Riel, supra,* 22 Cal.4th at p. 1223.) ■ The lying-in-wait special circumstance adequately distinguishes between first degree murders that are death eligible and those that are not. (*People v. Hillhouse, supra,* 27 Cal.4th at p. 510; *People v. Carpenter, supra,* 15 Cal.4th at p. 419.) ■ Finally, the death penalty law adequately narrows the class of death-eligible defendants. (*People v. Burgener* (2003) 29 Cal.4th 833, 884 & fn. 7 [129 Cal.Rptr.2d 747, 62 P.3d 1]; *People v. Frye, supra,* 18 Cal.4th at pp. 1028–1029.) We reject defendant's remaining challenges to the death penalty law. (See *People v. Laursen* (1972) 8 Cal.3d 192, 205 [104 Cal.Rptr. 425, 501 P.2d 1145].)

### 6. *Cumulative Prejudice in Guilt and Penalty Phases*

Defendant concludes his challenge to the penalty judgment by asserting that the cumulative effect of the errors he raises mandates reversal. Our review of the record leads us to a different conclusion. No reasonable possibility exists that the sentencing jury would have reached a different result absent any of the claimed errors.

### III. DISPOSITION

We affirm the judgment in its entirety.

George, C. J., Baxter, J., Werdegar, J., Brown, J., and Moreno, J., concurred.

---

[13] Without citation to the record, defendant claims that counsel's arguments did not permit the jury to conclude nonextreme or emotional disturbances could be considered mitigating evidence under section 190.3, factor (k). To the contrary, the prosecutor expressly argued that if the jury did not find that factor (d) applied, it could consider under section 190.3, factor (k) all of the evidence the defense psychiatrists and psychologists presented.

**KENNARD, J., Concurring.**—I agree with the majority, except for its summary rejection of defendant's claim that the lying-in-wait special circumstance (Pen. Code, § 190.2, subd. (a)(15)) does not adequately distinguish between cases in which the death penalty is appropriate and those in which it is not, a function required by the Eighth Amendment to the federal Constitution. (Maj. opn., *ante*, at p. 868.) In previous decisions, I have expressed a "growing concern" that in expansively construing the scope of the lying-in-wait special circumstance, this court's decisions "may have undermined the critical narrowing function of the lying-in-wait special circumstance: to separate defendants whose acts warrant the death penalty from those defendants who are 'merely' guilty of first degree murder." (*People v. Ceja* (1993) 4 Cal.4th 1134, 1147 [17 Cal.Rptr.2d 375, 847 P.2d 55] (conc. opn. of Kennard, J.); see also *People v. Hillhouse* (2002) 27 Cal.4th 469, 512 [117 Cal.Rptr.2d 45, 40 P.3d 754] (conc. opn. of Kennard, J.).) Recently, a federal circuit judge concluded, albeit in dissent, that California's lying-in-wait special circumstance is so broad that it violates the Eighth Amendment. (*Morales v. Woodford* (9th Cir. 2004) 388 F.3d 1159, 1180–1189 (conc. & dis. opn. of McKeown, J.).)

I first expressed my concerns about the lying-in-wait special circumstance 11 years ago in *People v. Ceja, supra,* 4 Cal.4th 1134. In over 150 death penalty cases decided by this court since then, we have seen none in which lying in wait was the only special circumstance found true by the jury. This may well reflect a view that lying in wait should not be the sole basis for imposing the death penalty.

Here, I need not decide whether the lying-in-wait special circumstance, as construed by this court, violates the Eighth Amendment. For, as I explain below, even if the trial court erred by instructing the jury on the lying-in-wait special circumstance, the error was harmless.

The jury found true not only the special circumstance allegation that defendant committed the murder by lying in wait, but also a special circumstance allegation that the murder occurred in the commission of a robbery. (Pen. Code, § 190.2, subd. (a)(17).) Thus, even without a lying-in-wait special circumstance, the case would have proceeded to a penalty phase. And the lying-in-wait special circumstance had no effect on the evidence presented at the penalty phase: The prosecution could have presented the same aggravating evidence if that special circumstance had not been alleged and found true.

The aggravating evidence was strong. Defendant and his girlfriend strangled and beat to death an acquaintance so they could rob her and steal her car. The killing was carefully planned and brutally carried out, and defendant showed absolutely no remorse for the crime. Moreover, he had a substantial criminal record that included four felony convictions as an adult and two juvenile adjudications for robbery. Thus, even if the trial court had not instructed the jury on the lying-in-wait special circumstance, I conclude, beyond a reasonable doubt, that the jury would still have returned a verdict of death. (See *Sanders v. Woodford* (9th Cir. 2004) 373 F.3d 1054, 1063 [beyond-a-reasonable-doubt standard applies when the jury considers an invalid special circumstance at the penalty phase].)