Filed 4/19/13  P. v. Saesee CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>ALBUNG SAESEE,<br><br>    Defendant and Appellant. | F062915<br><br>(Super. Ct. No. VCF231609)<br><br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County.  Joseph A. Kalashian, Judge.

David F. Candelaria for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Leanne LeMon, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Appellant Albung Saesee was convicted by a jury of murder in the first degree (Pen. Code,[1] § 187), assault with a deadly weapon (§ 245, subd. (a)(1)), and criminal

---

[1]All further references are to the Penal Code unless otherwise indicated.

threats (§ 422).  In addition the jury found true the special allegations that appellant personally and intentionally discharged a firearm causing great bodily injury during the commission of the murder (§ 12022.53, subd. (d)), and used a firearm within the meaning of sections 1203.06, subdivision (a)(1) and 12022.5, subdivision (a)(1).  The trial court subsequently sentenced appellant to a term of 50 years to life on the murder and firearm counts consecutive to a term of 3 years 8 months on the remaining counts.

On appeal, appellant contends the trial court erred in failing to provide him with a separate interpreter throughout the proceedings, in admitting certain photographs, and in allowing the prosecution to use appellant's statement made to a nurse shortly after the killing.  We find appellant's contentions without merit and affirm the judgment.

## FACTS

On the morning of January 4, 2010, appellant and his friend Chai See[2] went fishing.  While fishing, appellant drank two "Smirnoffs."  Afterwards, they went to Chai's house where appellant's wife Emee, the victim in this case, and others joined them.  According to Chai, appellant appeared drunk by the time he and Emee left.

Appellant and Emee arrived home sometime around 9:00 p.m. and began arguing. The argument was in English.  During the argument, Emee called the police.  Visalia Police Officers Robert Gilson, Daniel Roberts, and Steve Howerton were dispatched to the disturbance call at 10:37 p.m. and arrived shortly thereafter.  Upon arriving at the residence, the officers spoke to both appellant and Emee as well as other family members and learned that the disturbance was verbal only.  There was no allegation of violence between the two.

Emee and appellant continued to argue after the officers' arrival.  Officer Roberts testified that Emee was upset because appellant had told her to leave their home and that she was no longer welcome there.  He spoke to Emee and tried to diffuse the situation.

---

[2]Due to the large number of witnesses with the same last name, we will refer to witnesses by their first names in this opinion.  No disrespect is intended.

He explained that although she was not required to leave the home, she should consider leaving for the evening and staying with a friend or family member in the interest of preventing further argument. Emee refused to leave and was upset with the officers for not requiring appellant to leave. He explained that they could not require either to leave the home, and there was nothing more the officers could do.

As officers were leaving, Emee mentioned that appellant had firearms in the residence, however she denied that appellant threatened her with them in any way. Officer Roberts asked appellant if he indeed had firearms in the home, and appellant advised he had shotguns for hunting. Appellant allowed the officers to inspect the guns. Appellant led both Officers Roberts and Gilson into a bedroom where he produced two shotguns from a closet, both of which were contained in zippered cases. Officer Gilson inspected the guns, noting they were both unloaded, legal to possess, and that there was no ammunition in the gun cases. Because the guns were legal, both guns were returned, in their cases, to appellant, who placed them back into the closet.

Before leaving, the officers noticed that although it was apparent appellant had been drinking, he did not appear extremely intoxicated. Appellant was able to communicate in English with the officers. The officers left the residence but remained outside for a few minutes in case the two continued arguing. While outside, Emee again contacted the officers, stating that appellant continued to tell her she had to leave. The officers attempted one last time to persuade Emee to leave the residence for the night to prevent any further arguing, but she refused. Officer Howerton again explained to appellant that he had no right to prevent Emee from staying at the home. Appellant stated he understood and said he just wanted to go to bed. The officers left the residence and did not return for approximately one hour when they received a second dispatch to the home.

Appellant and Emee continued to argue after officers left the home. At some point, appellant went into his room and emerged with two 12 gauge shotguns and

3.

wearing a camouflage jacket. When appellant came out of the room, appellant's mother Naleh was in the living room watching television with her husband Aimai, Emee, and her young grandson. Naleh testified that when appellant came out of the room with the guns, Aimai confronted appellant and told him "stop." At that point, the two struggled over the guns and the gun went off twice. When Naleh looked back, she saw Emee was shot, lying next to the front door, and not moving.[3] Naleh and her grandson then ran out of the house.

Aimai testified that after the police left, he was sitting on the couch with his family when appellant went into his room. Appellant came out some time later and was carrying two shotguns on his hips. Aimai told appellant "no, no, don't shoot, don't shoot" and appellant responded "don't come." However, Aimai approached appellant and grabbed the guns and one gun "went off." According to Aimai, he grabbed the guns by the barrels, pushing them together, and attempted to push them to the ground. As Aimai was pushing the guns down, he turned to the side and the gun fired. While the two continued to struggle, another shot was fired. After Aimai was able to get the guns from appellant, Aimai and Aiyoy, appellant's son, fought with appellant, attempting to hold him while the police responded. During this time, appellant made his way to the kitchen where he was able to obtain a knife and attempted to stab himself. Aimai testified he grabbed the knife and in the process of taking it away, he was cut. He denied that appellant tried to stab him and claimed not to remember his preliminary hearing testimony where he stated appellant tried to stab him. Aimai also denied his preliminary hearing testimony that the gun fired before he grabbed the gun.

Aiyoy testified that after the police left, he saw appellant eating in the dining room. Aiyoy went to his room and about a half hour later, appellant opened his bedroom

---

[3]At trial Naleh claimed she did not see Emee during the shooting, however, she admitted telling an officer that Emee had tried to open the door to leave, but she could not get the door open and the gun went off.

4.

door.  Appellant was holding his two shotguns and was wearing his hunting clothes. Appellant told Aiyoy, "'Don't come out.  [¶] … [¶] Or I shoot you.'"  Appellant told Aimai to "'move'" and Aimai responded "'Don't do it.'"  Next Aiyoy heard two gunshots and then saw Aimai tackle appellant.  While appellant and Aimai struggled, he heard a third gunshot.  Aiyoy came to his grandfather's aid and began fighting with appellant.  During the struggle, both Aiyoy and Aimai were able to recover the shotguns from appellant.  After disarming appellant, Aiyoy went to call the police.  Appellant told him not to call the police, but he did so anyway.  Subsequently, appellant went into the kitchen and Aiyoy went to check on his mother Emee and noticed she was not breathing. While in the kitchen, appellant tried to stab himself.  Appellant then said that he was going to leave and tried to run out of the front door.  Aiyoy tackled appellant outside of the house and held him until police arrived.

Naga, appellant's sister, testified that approximately 15 to 20 minutes after appellant went to his room, she heard appellant say "move" and Aimai say "stop it." Naga admitted telling officers she heard appellant say "'Move out of the way.  Nobody come out.  I'm gonna shoot'" while he was in the hallway.  Naga remained in her bedroom and called the police when she heard a gunshot.  After she called the police, she could hear appellant fighting with Aimai and Aiyoy.

Visalia police officers were dispatched back to the house after the shooting, which occurred approximately one hour after the initial call.  Upon arrival, Officer Roberts observed two people fighting as they came out of the house.  Inside the home, Officer Roberts observed Emee lying on the floor adjacent to the front door with her head against the wall, unconscious.  He determined she was not breathing and had no pulse.  On the wall next to the front door where Emee was lying, he discovered a shotgun pattern that had not been there when he responded to the residence an hour earlier.  Shot pellets were later found in the wall.  There was also a large pool of blood on the floor next to the front door where Emee was found.

5.

Two shotguns and numerous rounds of shotgun ammunition were located in the hallway, along with blood. These items were not there when the officers responded initially; however, the two shotguns in the hallway were the same two shotguns the officers had inspected on the first visit. Appellant was now wearing a camouflage jacket, which he had not been wearing when officers contacted him an hour earlier. Officers found live rounds of ammunition in appellant's jacket, as well as numerous live rounds on the floor in the hallway and outside the front door where appellant and Aiyoy had been fighting.

Dr. Burr Hartman testified that he performed the autopsy on Emee and opined she died from a single shotgun wound to the back which severed her spinal cord and her left subclavian artery. Because the shot severed her spinal cord, she would have been immediately incapacitated after the injury and would not have been able to move. Dr. Hartman removed shotgun wadding and numerous birdshot pellets from Emee's body.

After appellant was arrested, he was transported to the hospital for treatment of his injuries. Nurse Carla Mena noted that appellant had abrasions to his face and a laceration to his head that required staples to repair. She noted that appellant seemed intoxicated and that his blood was drawn during his treatment. In the course of treating appellant, Nurse Mena asked appellant how he was injured. She could not recall his exact response, but noted he stated something to the effect of "'I told her to leave. She didn't want to leave and they were hitting me, so I got my gun.'" She also recalled him stating "'I just shot.'" Officer O'Rafferty was also present while appellant was being treated. He testified that he took verbatim notes while appellant was speaking and that appellant stated "that he told his wife to go to bed, but she wouldn't, and that he—she had called the cops three times to have him arrested. And he said that he told her if they come, I will shoot, and that he didn't know who he had shot, but he just shot." Appellant also asked the officer if he knew how much prison time appellant would get for "this." After

appellant was taken to the jail, he wrote "Son, I love you" in blood on his cell wall.  The statement was written in English.

Aiyoy testified appellant knew how to handle guns and was a hunter.  He also noted, as did other family members, that appellant and Emee did not argue often.  He stated appellant was not a violent person, although he recounted an incident where appellant pointed a gun at his other son, Aisai.

Appellant's family members testified appellant was drunk on the night of the shooting and that he drank often.  Officer O'Rafferty noted that when he contacted appellant at 12:25 a.m., he appeared intoxicated and was unable to stand on his own.

*Defense Case*

Aiyoy testified that when appellant had held a gun to Aisai in the prior incident, it was not to threaten him, but rather to communicate to him that he should not go out at night.  He explained that Aisai had previously been shot, and that another brother had been killed.  He stated appellant was trying to educate Aisai that someone could kill him.  He noted that the gun was unloaded during the incident.

Dr. Alan Barbour, a forensic pathologist, testified that appellant's blood-alcohol level when tested at the hospital at approximately 1:00 a.m. was 0.23 percent.  Another blood draw conducted at 2:34 a.m. revealed a blood-alcohol level of 0.17 percent.  Based on these numbers, Dr. Barbour opined appellant's blood-alcohol level at the time of the offense would have been between 0.20 and 0.25 percent.  He further opined that a person with that level of blood alcohol would obviously appear intoxicated, and that a normal person would have difficulty in walking, in shifting attention between tasks, would likely have slurred speech, and may have difficulty in forming short-term memories.  However, he noted that chronic alcoholics may still be able to function, even at very high levels of intoxication.

**DISCUSSION**

**I.     The Lack of a Separate Court Interpreter Did Not Constitute Reversible Error**

Appellant argues that his due process rights were violated when the trial court failed to provide him with a separate interpreter throughout the trial.  He claims such an error denied him a fair trial and requires a reversal.  We find appellant waived the right to a separate interpreter and find further that even if there were no valid waiver, any error was harmless beyond a reasonable doubt.

Pursuant to article I, section 14 of the California Constitution, a "person unable to understand English who is charged with a crime has a right to an interpreter throughout the proceedings."  Our Supreme Court in *People v. Aguilar* (1984) 35 Cal.3d 785 explained that interpreters serve three separate yet important roles in a criminal proceeding by (1) facilitating the questioning of non-English-speaking witnesses (witness interpreters), (2) aiding non-English-speaking defendants in understanding the discussions between the court, the attorneys and the witnesses (proceedings interpreter), and (3) enabling non-English-speaking defendants to communicate with their attorney (defense interpreter).  (*Id*. at p. 790.)  In that case, the court held that allowing the prosecution to "borrow" the defendant's interpreter to interpret for the prosecution's witnesses, without a valid waiver, violated the constitutional mandate.  (*Id*. at pp. 787-794.)

**A.     Appellant waived the right to a separate interpreter**

As the right to an interpreter is based in the California Constitution, it requires a personal, intelligent, and voluntary waiver from a defendant.  (*People v. Aguilar*, *supra*, 35 Cal.3d at p. 794; see *People v. Estrada* (1986) 176 Cal.App.3d 410, 416-417 [defendant personally waived right to interpreter during trial].)  The right to an interpreter, for someone who does not speak English, may also implicate federal constitutional rights, such as the right to due process, the rights to confront and cross-examine witnesses, the right to counsel, and the right to be present during a criminal

8.

proceeding. (*United States ex rel. Negron v. State of New York* (2d Cir. 1970) 434 F.2d 386, 389 (*Negron*).) Such rights are only waived if done so knowingly and intelligently. (*Id.* at p. 390 [waiver defined as "'an intentional relinquishment or abandonment of a known right'"].)

Here we find that appellant was indeed informed of and waived his right to a personal interpreter. At the preliminary hearing, the trial court specifically informed appellant of his right to a separate interpreter.[4] It is important to note that appellant was being assisted by an interpreter at the time of this discussion. Not only was appellant specifically advised of the right to have a separate interpreter, it was clear from the proceeding that appellant discussed this right with his attorney prior to giving the waiver. On the record before this court, appellant can hardly contend that he was unaware of his right to a separate interpreter. Appellant does not dispute that he in fact waived the right to a separate interpreter at the preliminary hearing but, rather, argues that the failure to obtain a renewed waiver at trial was error. We disagree.

---

[4]The following exchange took place at the preliminary hearing:

"THE COURT: Now, we are here for the preliminary hearing in the matter of [appellant]. We have had a brief discussion about how we are going to be proceeding at bench.

"And [defense counsel], the first question that I need to have answered is if [appellant], who is presently being assisted by the Court appointed interpreter, if he expressly waives his right to have an individual interpreter and is willing to share that interpreter with the—so that the witnesses—the interpreter will be able to interpret the witnesses as they testify.

"[DEFENSE COUNSEL]: Yes, Your Honor. I have spoken to him and advised him that he does have a right to have his own interpreter. He waives that right. And I explained to him that in doing that he would be essentially sharing the interpreter with whomever else the interpreter is going to interpret for.

"THE COURT: Very well. And I just need to hear this from [appellant]. And as I indicated, you are being assisted by the interpreter.

"[APPELLANT]: Yes.

"THE COURT: Do you expressly waive that right?

"[APPELLANT]: Yes."

9.

Initially, we note that the waiver to a separate interpreter, when taken at the preliminary hearing was not limited to that proceeding. Under federal authority, once a valid waiver is given, "it continues through the duration of the proceedings unless it is withdrawn or is limited to a particular phase of the case." (*People v. Crayton* (2002) 28 Cal.4th 346, 362.) In *Crayton*, our Supreme Court explained that a court was not required to readvise a defendant of his or her right to counsel and take a new waiver after that right had been waived in a prior proceeding. (*Id.* at pp. 362-363.) Indeed, courts have held that waiver of other constitutional rights remain in effect unless validly withdrawn or limited to a particular proceeding. (See *People v. Smith* (2005) 132 Cal.App.4th 924, 932-936 [where defendant waives right to jury trial, that waiver remains valid following mistrial when waiver was not withdrawn].) Nothing in the present exchange appeared to limit waiver of a shared interpreter solely to the preliminary hearing. In fact, both defense counsel and the trial court noted the interpreter would be used for witnesses as they testify. The waiver implied that the practice would be used for testimony of all witnesses who spoke the same language. This is in contrast to a stipulation as to evidence taken moments later and was noted by the court to be for the purpose of preliminary hearing only.

Appellant argues "there was no waiver by Appellant … to the right to an interpreter at the trial itself. The court simply instructed Appellant that he would be allowed to share the single interpreter the Court was able to secure for trial with the prosecution and defense witnesses." This is not an entirely accurate statement of the events as they occurred at trial. The issue of the shared interpreter was raised not once but twice after the explicit waiver of the right at the preliminary hearing. On February 24, 2011, approximately a week before appellant's trial began, a brief pretrial hearing was held. Appellant was present at the hearing and was being assisted by an interpreter. The issue of the interpreter was raised at the hearing, with the prosecutor noting that appellant's attorney had agreed to stipulate to using a single interpreter for

10.

both appellant and the prosecution witnesses as appellant also spoke English.**5** Appellant's attorney explicitly agreed to the procedure, and appellant did not object. On March 7, 2011, during the in limine conference, the issue was once again briefly raised, with the trial court noting that defense counsel had agreed to the use of a shared interpreter at the prior hearing.**6** The court employed the same procedure it had used at the preliminary hearing; namely, to have the interpreter interpret for witnesses who also spoke Lahu, specifically instructing him to speak loudly enough so that appellant could hear the interpretation. On this record it is clear that the waiver of the shared interpreter was never revoked or limited by appellant.

This case is not unlike *People v. Estrada*, *supra*, 176 Cal.App.3d 410. There, at trial, the defense counsel agreed to have the defense interpreter only interpret words of the witness interpreter when she disagreed with the translation provided by the witness interpreter. The defendant was present during that hearing. Later in the day, the

---

**5**The following exchange took place at the hearing:

"[PROSECUTOR]: Your Honor, I did speak with [defense counsel] today. We do have the issue that there are a lot of Lao witnesses. [Appellant]'s also Lao. [Defense counsel] said that he would stipulate that we can use the same Lao interpreter as his client does speak English also.

"[DEFENSE COUNSEL]: That's correct. We would stipulate to that. I see no reason not to."

**6**At trial, which was before the same court as the pretrial hearing, the following exchange took place:

"[PROSECUTOR]: … At the pretrial, I believe it was last week, [defense counsel] stipulated on the record that we could use the same interpreter as we did at the preliminary hearing.

"THE COURT: He did. And we'll do that. So we'll have one interpreter, [Mr. Aaipo Saesee], interpreting for the witness as well as interpreting for [appellant]. The way we'll do that is Mr. Saesee's going to have to speak loud enough for [appellant] to hear that interpretation. If [appellant] has any questions, then we'll pause and let Mr. Saesee talk with [appellant]."

"[DEFENSE COUNSEL]: Yes."

Appellant's attorney went on to object to the use of a noncertified interpreter, an issue not raised in this appeal, but he never objected to the procedure of using a single interpreter for both appellant and the prosecution witnesses.

11.

defendant expressly waived that right to have the interpreter interpret every word. The court found a knowing and intelligent waiver of the right to an interpreter under those circumstances. (*Id*. at pp. 416-417.)

This is in stark contrast to *People v. Aguilar*, where the defendant was never advised of his right to an interpreter nor did he ever personally waive that right. Nothing in the record in *Aguilar* supported a finding that the defendant even knew he had a right to a separate interpreter. Indeed, in that case, the only exchange regarding the sharing of the interpreter with the prosecution witnesses was held between the court, defense counsel and the interpreter, and was conducted entirely in English. (*People v. Aguilar*, *supra*, 35 Cal.3d at p. 795.) There was no indication in that case whether the defendant understood that conversation or his rights. (*Id*. at pp. 794-795.) Unlike in *Aguilar*, appellant was specifically advised of his right to a separate interpreter in his native language, he had an opportunity to fully discuss the issue with his counsel, and he personally waived that right. He never limited that right and his counsel expressly agreed to the same procedure at trial in appellant's presence. Based on the entirety of the record, we find appellant validly waived his right to a separate interpreter at trial.

**B.      Any error in failing to provide an interpreter was harmless beyond a reasonable doubt**

Even if this court were to conclude there was not a valid waiver, the error would not require reversal. In *People v. Rodriguez* (1986) 42 Cal.3d 1005, the California Supreme Court addressed the issue of the standard of review for a violation of a defendant's right to an interpreter. Due to the implications of various federal constitutional rights, as discussed above, the court adopted a *Chapman* standard requiring reversal unless the court finds the error is harmless beyond a reasonable doubt. (*People v. Rodriguez*, at p. 1010; *Chapman v. California* (1967) 386 U.S. 18.) The error is harmless if the appellate record does not show there was an actual interference with the defendant's ability to understand the trial or consult with counsel during a critical stage of

12.

the proceeding, as demonstrated by remarks of counsel, the court, or the defendant. (*People v. Rodriguez, supra*, 42 Cal.3d at p. 1014 & fn. 6.)

The analysis in *Rodriguez* is instructive here. There two defendants, each requiring the assistance of an interpreter, shared a single interpreter during a portion of the trial while a second interpreter was used to translate witness testimony. On appeal, the defendants argued this situation could have hampered their rights to consult with their attorneys. Due to the close proximity of both defendants, the risk that the other would overhear communications with his respective attorney was increased. Additionally, if one defendant used the sole interpreter to speak with counsel during testimony, the other would have been deprived of a contemporaneous translation of the proceedings. (*People v. Rodriguez, supra*, 42 Cal.3d at pp. 1013-1014.) In finding the error was harmless beyond a reasonable doubt, the court noted there was nothing in the record to support a showing that the defendants suffered an interruption of their comprehension of the proceedings or communication with their attorneys. (*Id*. at pp. 1014-1015.) Indeed, the court explained that the proper test was to determine "whether an actual material interference with the defendant's right has been shown or even asserted." (*Id*. at p. 1014, fn. 6.) An evaluation of the record as a whole is required to determine if any error occurred. (*Ibid*.)

Using this standard, on the entirety of the record, it is clear that any error was harmless beyond a reasonable doubt. Initially, we note that appellant points to nothing specific in the record to support his blanket assertion that he was denied "the ability to participate in his own defense." Rather, appellant relies on several cases finding the denial of a separate interpreter reversible error. Appellant's reliance on these cases is misplaced for two reasons. First, each of the cases upon which appellant relies was decided prior to *People v. Rodriguez*, which settled the issue of the proper standard of review on appeal. Second, these cases are factually inapposite to the case at bar.

13.

Appellant relies on *People v. Menchaca* (1983) 146 Cal.App.3d 1019 to support his claim of error. This case is distinguishable from *Menchaca*. In that case, the defendant was illiterate and neither spoke nor understood any English. (*Id*. at p. 1021.) Furthermore, the defendant specifically moved that separate interpreters be provided for non-English-speaking witnesses and objected to the use of a single interpreter for himself and the witness during trial. (*Id*. at pp. 1021-1022.) The court in *Menchaca* took judicial notice of the fact that witness interpreters and witnesses often speak at close range such that one cannot assume a defendant hears and understands the exchange in his or her native language. (*Id*. at p. 1024.) Furthermore, it appears that the defense counsel in that case had reservations about the defendant's ability to hear the exchange. As the court in *Menchaca* explained, the defendant who did not understand English, once deprived of an interpreter, was essentially removed from the proceedings as he could not understand the testimony, the court's rulings, nor did he have the ability to communicate with his counsel. (*Id*. at pp. 1024-1025.)

Likewise in *Negron*, another case upon which appellant relies, the defendant neither spoke nor understood English, and his counsel spoke no Spanish. (*Negron*, *supra*, 434 F.2d at p. 388.) The defendant received no contemporaneous translation of testimony during the trial. An interpreter was only used to translate Spanish into English for witness testimony. The defendant received only brief summaries of the testimony at the end of the day, depriving him of the opportunity to be present in his own trial. The court explained, the trial was essentially a "babble of voices" for that defendant. (*Id*. at p. 388.)

*People v. Aguilar* is likewise distinguishable. In that case there was evidence that the defendant in fact spoke English, however, the trial court appointed him an interpreter for the proceedings. (*People v. Aguilar*, *supra*, 35 Cal.3d at p. 787.) During trial, the defendant's interpreter was borrowed to interpret for two prosecution witnesses. Defense counsel, without ever consulting with the defendant, agreed to the procedure. (*Id*. at p.

14.

789.) The court found this process violated the defendant's right to an interpreter, and reversed the conviction *without a discussion as to how the violation of the rights specifically affected that defendant or any discussion as to the proper standard of review*. Indeed, two years passed before the California Supreme Court took up the issue of the proper standard of review in *People v. Rodriguez.*

These cases are in stark contrast to this case. The conclusion that appellant was deprived of the ability to understand the proceedings or to confer with counsel is not supported by the record. The record is replete with references to appellant's English-speaking ability. Not only did witnesses note that appellant spoke English but appellant communicated in English to officers on the date in question. He communicated in English to the nurse regarding his injuries, and he wrote in English on his cell wall. Appellant's counsel conceded on various occasions that appellant could communicate in English.[7] There was evidence at trial that the argument between appellant and the victim occurred in English. Appellant can hardly compare himself to the defendants in *Menchaca* and *Negron* where it was undisputed that the defendants spoke no English. (*People v. Menchaca*, *supra*, 146 Cal.App.3d at p. 1021; *Negron*, *supra*, 434 F.2d at p. 388.) Appellant certainly was not adrift in a "babble of voices" as the defendants in those cases. This record does not support an assumption that appellant could not communicate with counsel during trial.

---

[7]This is also supported by the fact that appellant failed to request an interpreter at his arraignment on the complaint. Although this court was not provided the reporter's transcript of that hearing, it is evident from the minute order that appellant was arraigned, appointed a public defender, entered a not guilty plea, and waived time for his preliminary hearing, all without the assistance of an interpreter. Indeed, it was not until the next hearing that an interpreter was even requested for appellant. At that hearing, defense counsel expressly stated that he had spoken to appellant and that he spoke "broken English" and noted he would not need an interpreter to visit appellant at the jail. At that hearing, the court appointed an interpreter without any inquiry into the extent of appellant's English-speaking abilities. It appears that an interpreter was appointed at the following hearing.

15.

Additionally, appellant was not placed in a situation where he could not hear and understand the interpretation of the questions and answers as in *Menchaca*. Here, the court specifically instructed the interpreter to speak loudly enough so that appellant could hear the entire exchange. The situation is not unlike the situation in *People v. Baez* (1987) 195 Cal.App.3d 1431, where the defendant was moved to a position in the courtroom so as to facilitate his hearing of the questions and answers in his native tongue. The court noted that under those circumstances, the record "strongly" indicated the defendant was able to understand the proceedings. (*Id*. at p. 1436.) Although the *Baez* court ultimately found the error was reversible because the defendant was physically separated from his counsel, thereby diminishing his ability to communicate with counsel, that did not occur in this case. Rather, arrangements were made for the interpreter to speak loudly enough for appellant to hear while seated next to counsel. That this procedure was followed was evident by the fact that the defense attorney asked that the interpreter speak up when he was having difficulty hearing. Further, because appellant spoke English, he was not separated from his counsel during testimony and would have been able to consult with him as needed.[8] Indeed, this conclusion is supported by the fact that appellant's counsel interrupted the proceedings to question an interpretation given by the interpreter.[9]

---

[8]While the ability to consult with counsel during the testimony is often a factor upon which the California courts have relied (see *People v. Aguilar*, *supra*, 35 Cal.3d. at pp. 790-791), several federal courts have held that the right to an interpreter does not require that defendants be able to speak to their counsel during testimony as long as they have the ability to communicate during breaks and recesses. (See *United States v. Johnson* (7th Cir. 2001) 248 F.3d 655, 664; *United States v. Bennett* (11th Cir. 1988) 848 F.2d 1134, 1140-1141, superseded on other grounds by rule as stated in *United States v. Moore* (11th Cir. 2007) 504 F.3d 1345.)

[9]During the questioning of Naleh, appellant's mother, the following exchange took place:

"[DEFENSE COUNSEL]: I'm going to object, your Honor; nonresponsive, also foundation. This picture doesn't appear to be the picture of the scene at the time of the—when she was sitting there. I'm not sure, but it appeared to be that she pointed and said this wasn't here, it was there. I'm not sure. Maybe it is.

16.

After reviewing the testimony of witnesses who used the interpreter, we find that the context of the testimony was not such as to deprive appellant of due process. Much of the testimony was either peripheral to the case or, in fact, favorable to the defense. Considering the record as a whole, we are confident that any error in allowing the sharing of the interpreter during the testimony of the Lahu-speaking witnesses was harmless beyond a reasonable doubt.

## II. The Trial Court's Admission of the Photographs Was Not an Abuse of Discretion

Appellant contends the admission of photographs of the wound to the victim's back as well as various photographs of the crime scene and of the pellets removed from the victim's body was unduly prejudicial.

The appropriate standard of review for determining whether admission of the photographs was error is abuse of discretion. Unless the prejudicial effect clearly outweighs the photos' probative value, a trial court's ruling under Evidence Code section 352 will not be disturbed on appeal. (*People v. Clair* (1992) 2 Cal.4th 629, 660; *People v. Allen* (1986) 42 Cal.3d 1222, 1255-1256.) Using this standard, we will address each of the challenged photographs in turn.

### A. People's exhibit 30: The fatal wound to the victim's back

People's exhibit 30 depicts a large shotgun wound to the victim's back. In determining whether this photograph was properly admitted, the threshold question is whether it was relevant to any material issue. (*People v. Hendricks* (1987) 43 Cal.3d 584, 594.) The admission of relevant autopsy photographs is within the sound discretion of the trial court, even where they are used cumulatively to portray injuries already detailed by an expert. (*People v. Burney* (2009) 47 Cal.4th 203, 243; *People v. Wilson*

"[PROSECUTOR]: For the record, your Honor, I did not realize that [defense counsel] spoke Lao, but we can ask the interpreter and the witness to clarify what they really said in Lao."

The questioning went on to establish that the item at issue in the picture was in a different position on the night in question.

17.

(1992) 3 Cal.4th 926, 938; *People v. Marsh* (1985) 175 Cal.App.3d 987, 998.) Here, although appellant claims otherwise, the admitted photograph was relevant and was not unduly prejudicial.

Initially we note that appellant never objected to this exhibit. While it is true that appellant did object to "pictures of the blood" and "to showing [the victim's] face" he never specifically objected to the autopsy photograph that was ultimately admitted as People's exhibit 30.[10] Indeed, when the exhibit was actually proffered as evidence, defense counsel expressly stated "no objection." Failure to object to the admission of evidence forfeits the issue on appeal. (Evid. Code, § 353; *People v. Farnam* (2002) 28 Cal.4th 107, 185; *People v. Champion* (1995) 9 Cal.4th 879, 918, overruled on other grounds in *People v. Combs* (2004) 34 Cal.4th 821, 860.) However, even if this court were to consider the issue, it is clear that the admission of the photograph was not an abuse of discretion.

Secondly, we take issue with appellant's claim that he offered to stipulate as to the cause of death. Nowhere in the record does appellant offer to stipulate to any facts regarding the cause of death. While appellant states in his argument that the victim is deceased and everyone is "going to testify how she died" and that "she was shot," this is

---

[10]At the in limine conference during the discussion of the admission of photographs, appellant objected as follows:

"[DEFENSE COUNSEL]: The only ones I have objections to are the ones—the woman's dead. I mean she's dead. Why do—you know if somebody comes in and slaughters somebody with a gun or whatever, why do you need pictures of blood on the wall or blood here? It doesn't add anything to the case except to incite the prejudice of the jury. So I would object to any pictures of the blood.

"I would object to showing her face. We know she's a woman. We know she was a certain age. She's deceased. Everybody's going to testify how she died. There's a little different versions of how she died, but she was shot. I just don't see the purpose of showing her nor showing the blood all down the corridor or whatever. What is the purpose of that? Does it add to anything that Dr. Hartman … [¶] … [¶] … is going to say, that she died from a gunshot wound? I don't believe it does. So I would object to any of that coming in. And I would submit."

18.

a far cry from a stipulation to that effect. In fact, the only stipulation proffered in this case came well after testimony related to cause of death. The stipulation related to the identity of the victim as being the same person that was found at the scene and autopsied by the doctor. As we shall explain below, even if defense counsel's statements could be taken as an offer to stipulate to the cause of death, the photograph would still be relevant and admissible on the issue of malice.

Appellant relies on a line of cases beginning with *People v. Ramos* (1982) 30 Cal.3d 553[11] for the proposition that "when the defendant offers to stipulate to the identity of the deceased and the fact that he or she was alive, any photograph of the deceased was irrelevant and must be excluded." Appellant misstates the holdings of these cases.

It is true that in *Ramos*, the California Supreme Court held that introduction of a photograph of a murder victim, *while alive*, was error when the defense stipulated that the victim was a human being and had been alive prior to the offense. (*People v. Ramos*, *supra*, 30 Cal.3d at pp. 577-578.) This is because admitting a photograph under such circumstances would serve no purpose other than to prejudice the jury in favor of the victim. Simply put, it would not be relevant to any contested issue in the case. (*Ibid.*; *People v. Poggi* (1988) 45 Cal.3d 306, 322-323; *People v. Kimble* (1988) 44 Cal.3d 480, 499.)

However, the challenged photograph here is not a photograph taken of the victim while living. Rather, the photograph was taken during the autopsy of the victim and depicted the fatal wound. Despite appellant's claims to the contrary, the photograph was relevant to a contested issue in the case, namely malice and intent to kill.[12] (*People v.*

---

[11]The United State Supreme Court granted certiorari and ultimately reversed the judgment of *Ramos* in *California v. Ramos* (1983) 463 U.S. 992 on other grounds.

[12]Even if we were to agree with appellant's proposition that he had stipulated to the manner of the victim's death, such a stipulation would have no effect on the issues of malice and

19.

*Booker* (2011) 51 Cal.4th 141, 170-171 [autopsy photographs relevant to demonstrate defendant committed murder]; *People v. Farnam*, *supra*, 28 Cal.4th at p. 185 [photographs regarding a victim's wounds are relevant to issue of malice].) Appellant was charged with first degree murder, which requires an element of malice. (§ 187, subd. (a).) This was a hotly contested issue at trial, with appellant claiming he had no intent to commit the crime and that the shooting was accidental. Here the photograph depicted the wound as high on the victim's back between her shoulder blades and could reasonably be used to demonstrate that the shooting was not accidental. (*People v. Booker*, *supra*, at pp. 170-171; *People v. Carrera* (1989) 49 Cal.3d 291, 328-329 [admission of 25 photographs of homicide victim and crime scene, including enlargements to life-size and larger than life-size, was not abuse of discretion where photographs "helped to clarify the testimony of the medical expert"].)

Further, the photograph was taken during the autopsy and simply depicts the wound. While photographs of a murder victim can certainly be repugnant and disturbing, there was nothing so gruesome about this photograph to potentially evoke any prejudice against appellant. (*People v. Burney*, *supra*, 47 Cal.4th at p. 243.) No abuse of discretion in admitting the photograph has been shown.

### B.  People's exhibits 10, 18, and 19:  Crime scene photographs depicting blood

Appellant contends the photographs of the crime scene containing blood stains were also unduly prejudicial and lacking in any probative value. He again bases this contention on the erroneous presumption that he had "stipulated to the manner the deceased was killed." Even if appellant had entered into or offered such a stipulation, it would not affect the relevance of these photographs.

---

intent to kill.  The prosecution still had the burden to prove these elements of the offense charged.

Exhibit 10 depicted the front door of the residence, a blood pool indicating where the victim was killed, and a hole in the wall from a shotgun blast. Exhibit 18 depicted much of the same scene from a further distance, and also encompassed some of the sofa where the victim and witnesses had been seated prior to the shooting. Exhibit 19 depicted a portion of the kitchen and hallway, another blood pool, numerous live shotgun shells and one spent shotgun shell, and the location of the two shotguns at issue. Each of these photographs provided relevant evidence for the jury to consider. Exhibits 10 and 18 provided the jury with the location of the victim when she was shot. In addition, these photographs showed the location of the shot pellets in the wall from one of the shotgun blasts as well as the sofa where the victim had been sitting prior to the shooting. Exhibit 19 showed the kitchen area where appellant fought with his family members, the location of the shotguns, and the numerous live rounds of ammunition that were found at the scene.[13] As the photographs were relevant to the issues in the case, their admission did not constitute an abuse of discretion. Likewise, upon review of the photographs, it is clear that they were not of a nature to evoke an emotional response so as to impermissibly sway the jury. (*People v. Loker* (2008) 44 Cal.4th 691, 705.) We find no error.

## C.     People's exhibits 32 and 33:  Photographs depicting the pellets and wadding removed from the victim's back

Lastly, appellant seems to object to the photographs depicting the pellets and wadding removed from the victim's back. We decline to reach this issue as there was never any objection to these photographs at trial. (Evid. Code, § 353; *People v. Farnam*, *supra*, 28 Cal.4th at p. 185; *People v. Champion*, *supra*, 9 Cal.4th at p. 918, overruled on other grounds in *People v. Combs*, *supra*, 34 Cal.4th at p. 860.) Appellant has not

---

[13]Appellant argues that because the identification technician could not state what the scene looked like immediately after the murder—only that the photograph was an accurate depiction of the scene when he arrived—that the photograph was not relevant. Not so. Any argument that the scene had been disturbed would go to the weight, not the admissibility, of the photograph. In addition, appellant made no objection to the foundation of the photograph at trial. He cannot now raise that issue on appeal. (*People v. Farnam*, *supra*, 28 Cal.4th at p. 185.)

provided a citation to any objection to these on the record. Nor has this court found any objection to the photographs of the pellets and wadding that were removed from the victim's body. Indeed, when the photographs were offered at trial, appellant affirmatively stated he had no objection to their admission. Nor has appellant proffered any argument why these innocuous pictures of pellets and wadding were either irrelevant or overly prejudicial. We decline to consider the issue on appeal.

## III.    Appellant's Statements Were Properly Admitted

Appellant contends his statement to Nurse Mena was improperly admitted because the statement could not reasonably be understood as an admission that he intended to shoot and kill the victim. We disagree.

At trial, Nurse Mena testified that she treated appellant for his injuries shortly after the shooting. While assessing him, she asked appellant how he received his injuries. He responded that he had been beaten up by his family and that he had told the victim to leave. He stated she did not want to leave and he had retrieved his gun. Nurse Mena could not recall the exact words appellant used to describe what happened but at one point recalled appellant stating, "'I just shot.'"

Officer O'Rafferty testified that he was present during the conversation between Nurse Mena and appellant. O'Rafferty took verbatim notes of appellant's statements. He testified he heard appellant say he told his wife to go to bed but she refused and "she had called the cops three times to have him arrested. And he said that he told her if they come, I will shoot, and that he didn't know who he had shot, but he just shot."

Appellant objected to the statements on hearsay grounds prior to their admission.[14] Relying on *People v. Allen* (1976) 65 Cal.App.3d 426, disapproved on other grounds in *People v. Green* (1980) 27 Cal.3d 1, 39, footnote 25, he now claims the statements were

_____

[14]Appellant also objected to the statements on the ground that they violated *Miranda v. Arizona* (1966) 384 U.S. 436. Although it appears the issue raised here is one of relevance and not hearsay, we will nevertheless address appellant's contention to forestall a later claim of ineffective assistance of counsel.

improperly admitted as implied statements of guilt. *Allen* has no application to this case. In *Allen*, the defendant was charged with grand theft of certain items of jewelry. During the trial, the prosecution sought to introduce evidence that the defendant told the deputy sheriff that he had some good "connections," that he could find out where the stolen jewelry was if one attempted to sell it, and that he would and did make a phone call to inform others that if the stolen jewelry at issue in that case was discovered, he wanted to be informed. (*People v. Allen*, *supra*, at pp. 431-432.)

In finding the statement was inadmissible, the court explained the statement was not relevant to any issue in the case. This was because the statement was not being offered for its express meaning—that he knew people who could find stolen property—but for an implied statement that he had stolen the victim's jewelry. (*People v. Allen*, *supra*, 65 Cal.App.3d at p. 433.) The court held that an "implied statement may be inferred from an express statement whenever it is reasonable to conclude: (1) that declarant *in fact intended* to make such implied statement, or (2) that a recipient of declarant's express statement would *reasonably believe* that declarant intended by his express statement to make the implied statement." (*Id*. at pp. 433-434.) The *Allen* court found that the inference sought by the prosecution was speculative at best, thereby not meeting the threshold requirement of relevancy as it had no "tendency in reason" to prove a fact of consequence.[15] (*People v. Allen*, at p. 434; see Evid. Code, § 210.)

There is no issue of any implied statement in the case at bar. The statement which was introduced was used for its express meaning; namely, that appellant had told the victim that if the police came to the home, he would shoot. The statement is not similar to the statement in *Allen*, which "involved a statement, clear on its face, to which the prosecution sought to ascribe a different, inculpatory meaning not directly inferable

[15]Indeed, the court found the only reasonable inferences from the defendant's statement was that he knew people who dealt in stolen goods. Such evidence would result in the admission of improper character evidence. (*People v. Allen*, *supra*, 65 Cal.App.3d at pp. 434-435.)

23.

therefrom." (*People v. Kraft* (2000) 23 Cal.4th 978, 1035.) There was simply no other implied meaning from the statement. Rather, the inference sought was that appellant intended to shoot the victim. Appellant's statement was used in this case as circumstantial evidence of his intent to kill. Such an inference was eminently reasonable from appellant's express words and was undoubtedly relevant on the issue of appellant's intent at the time of the shooting. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1009-1010 [defendant's statement to rape victim that he "knew what he was doing" provided inference he had committed similar crimes and was relevant to show state of mind].) We conclude the statement was relevant and admissible in these proceedings.

## DISPOSITION

The judgment is affirmed.

_____
PEÑA, J.

WE CONCUR:


_____
WISEMAN, Acting P.J.


_____
KANE, J.